**Jehan ABDUR–RAHEEM, formerly known as John Whitaker, Petitioner,**

**v.**

**Walter KELLY, Superintendent, Attica Correctional Facility, Respondent.**

**No. 96–CV–3851 ERK.**

United States District Court, E.D. New York.

April 28, 2000.

Memorandum Supplementing Decision June 5, 2000.

Norman R. Williams II, Julie E. Katzman, Mayer, Brown & Platt, New York City, in place of Peter C. Roth, Belle Harbor, NY, who withdrew, for petitioner.

Roseann B. MacKechnie, Florence M. Sullivan, Asst. Dist. Attys., Kings County, New York (Charles J. Hynes, Dist. Atty., Kings County, New York, of counsel), for respondent.

MEMORANDUM & ORDER

KORMAN, Chief Judge.

On the evening of January 4, 1976, four men were sitting at the bar of the Moulin Rouge in Brooklyn, drinking, talking, and

watching Dallas trounce Miami in the Superbowl. W–94–95, T2–118, 206.[1] Before the game ended, one of them, Charles Hill, was shot in the head by John Whitaker, as petitioner was then known. He would later confess to the murder, one of four of which he stands convicted, all committed within a period of twenty days. The victims were each felled by a bullet to the head. Sentencing Hearing, April 6, 1981, p. 12. Of the four judgments of conviction, two were entered upon jury verdicts. Petitioner was sentenced to twenty-five years to life—the sentences to run consecutively—on the judgments entered in these two cases. The conviction challenged in this petition is the basis for the second of the two consecutive sentences.[2] Petitioner pled guilty to the other two murders with the understanding that he could withdraw the guilty pleas and have the convictions set aside if he successfully challenged both of the judgments entered after trial.

The petition here challenges the conviction for the murder of Charles Hill. The issue raised is the admissibility of the eyewitness identifications that were made twenty days after the murder of Charles Hill. The lineup was inadvertently suggestive. Petitioner was the only person in the lineup who wore a three-quarter-length black leather jacket, recognized by the eyewitnesses as the same one worn by the man who killed Charles Hill. The suggestion was clearly inadvertent, however, because the subject of the lineup was a person other than petitioner. Petitioner, who was under arrest for one of the other murders, was put into the lineup as a filler.

The case turns on the admissibility of the identification evidence, because the confession petitioner gave was suppressed.

The ground for suppression was that, at the time he confessed, petitioner was represented by counsel on the other murder for which he had been jailed at the time of the lineup. *People v. Whitaker*, 75 A.D.2d 111, 428 N.Y.S.2d 691, 692–93 (1980). This ground—peculiar to New York jurisprudence—would not have provided a basis for suppression under the United States Constitution. *McNeil v. Wisconsin*, 501 U.S. 171, 175, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158 (1991). The question presented, then, is whether a conviction should be set aside because of inadvertently suggestive eyewitness identifications where the record demonstrates that the eyewitnesses picked out the right man.

### Background

The shooting occurred, as previously indicated, in a bar, while the attention of the patrons was focused on the Superbowl and on their conversation with each other. Arthur Shiloh, Vincent Cooke, and Samuel Hayward were regulars at the Moulin Rouge. T2–41–42, 163, 259. Shortly before the killing, Shiloh and Cooke were sitting there together, drinking scotch. W–84, 94, 155, 189; T2–208. Shiloh was having his third drink of the day, W–110, and Cooke was working on his second. W–189–190; T2–187. Hayward, who had had three or four drinks before arriving at the Moulin Rouge, T2–260, was sitting down the bar next to Charles Hill, part owner of the bar and an off-duty corrections officer. T2–261. Cecile Dukes was tending bar. T–337–338. Around six o'clock, another regular customer, Winfred Moore, came in and joined his friends Shiloh and Cooke at the bar, T2–206–207.

---

**1.** I take judicial notice that, contrary to the witnesses' and hearing judge's recollection, the 1976 Superbowl took place on January 18 between the Dallas Cowboys and the Pittsburgh Steelers, resulting in a narrow win for Pittsburgh, 21–17. On January 4, 1976, the Cowboys played Los Angeles in an NFC playoff game, beating them by a resounding 37–8. See http://www.geocities.com/jrbeasley/dallas/seasons/75over.html.

**2.** A petition challenging the other judgment entered after trial was dismissed by Judge Trager. *Abdur–Raheem v. Kelly*, No. 97 CV 2126 (E.D.N.Y., March 17, 1999), certificate of appealability denied, No. 99–2282 (2d Cir., January 27, 2000).

Three strangers entered the bar together and then split up. W–197. One took up a position near the window at the front of the bar. W–104, 157. The other two went to the bathroom, and upon returning began to talk with Hill, T2–61, one standing near the door and the other near the wall. After some time (witness estimates ranged from 10 to 30 minutes from the time the strangers entered the bar, W–104, 160, 199), the man near the wall (later identified as petitioner) shot and killed Hill, who fell to the floor. W–117, 161.

After the shooting, the man near the door pulled out a pistol and announced, "This is a stickup." T2–70. He then took Shiloh's money and Cooke's money, ring, and watch. T2–70. The man who shot Hill took a gun off Hill's body. T2–262. He took Moore's money, driver's license, car registration, and keys. T2–209. One of the three strangers took Hayward's wallet. T2–263. The man who had been standing by the window jumped over the bar and emptied the cash register. W–160. The man who had announced the stick up herded all the witnesses into the bathroom at the back of the bar. T2–70. According to Cooke, the shooter (petitioner) came back to the bathroom and asked Moore which key started his car. T2–178. Moore, however, said no such thing ever happened. T2–215. When the witnesses emerged from the bathroom, the robbers were gone. All the witnesses noticed that the shooter was wearing a black leather coat, and gave that description to the police. W–130, 182, 233; T2–214. A police flyer circulated after the shooting, however, indicated only that the killer wore a "black ¾ length coat." W–233, 254.

Some three weeks after the crime, on January 24, 1976, the police arrested a suspect, Lindsay Webb, in the murder of Charles Hill. W–215. Detective Anthony Martin decided to conduct a lineup. W–215. Since he was able to get only three black police officers to serve as "fillers," he filled out the line with two African–American men who happened to be in custody on unrelated crimes. W–216–217. One was petitioner, who was being questioned at the precinct that day about the murder of one Harriet Gathers. W–217. Unlike any of the other men in the lineup, petitioner happened to be wearing a black leather coat. T2–202.

Cecile Dukes, Arthur Shiloh, and Vincent Cooke viewed the lineup. The three witnesses waited together in a room at the precinct and were brought in to view the lineup one by one. W–220–221. Dukes, who went first, recognized no one. W–219. Shiloh was next, and after two or three minutes was also unable to identify anyone in the lineup as one of the robbers. W–90, 140–141. Cooke was the last to view the lineup. He identified petitioner as the man who shot Charles Hill. W–165, 220. Cooke described his identification:

> Well, I looked them all over carefully because I didn't want to make any mistakes and then I picked number one, the guy.... I said he appeared to be the one that I remember in the bar. And I could tell from his, you know—his coat is another thing. He had on a leather coat that I remembered. W–165

After Cooke returned to the room where the other witnesses were waiting, Shiloh asked to view the lineup again. W–220. This time he picked petitioner as the shooter. W–220. Shiloh explained,

> When I looked through the window the second time, I looked at the lineup, I looked at number one. I said, that has to be the man. W–146.
>
> . . . .
>
> ...I said that was the man, really, because you see like at the time he was standing there he didn't have the cap on, and but [sic] face features of him the black leather coat, the same thing, the black leather coat really set it off for me. W–147.

A month later, on February 24, 1976, Detective Clarence Crabb interviewed petitioner about the Hill homicide. T–694–702. According to Crabb, after being ad-

vised of his rights, petitioner told Crabb that he and two other men, Robert Blackman and Johnny Johnson, had been on their way to stick up another establishment when they stopped in the Moulin Rouge to get warm. T–701. While they were in the bar watching TV, petitioner noticed that a man seated at the bar started to move as though he were reaching for his "piece." T–701–702. Petitioner warned the man not to "do something foolish," T–702, and the man paused, but then reached for his gun. T–702. Petitioner told Crabb, "that's when I shot him, and when I shot him, Johnny Johnson jumped over the bar and announced this is a stick up. He went into the cash register and took the money out." T–702. By Crabb's account, petitioner's admissions continued with the details of the shooting's aftermath:

> He said Bobby Blackman, Johnny Johnson herded all the people in the bar to the rear. He said when they got ready to leave, he said I took some car keys from one of the people that was in the bar that had a car parked outside and he said I drove the car. We got in. I drove the car to a side street off of Herkimer Street, that was near his house. He said Bobby Blackman, he says I gave Bobby Blackman Hill's gun, he says, and he sold it someplace in the street. He wouldn't tell me what he did with his gun. He just said that he sold it. T–702.

Petitioner was subsequently indicted for the murder of Charles Hill and the robberies at the Moulin Rouge. His counsel moved to suppress any admissions or confessions and the identifications. At a *Huntley* hearing held on January 6, 1977, Detective Crabb testified about petitioner's confession. H–58–59. Crabb explained that he had arrested petitioner on January 24, 1976 for the murder of Harriet Gathers, H–26, and the meeting at which he took petitioner's statement took place at the Brooklyn House of Detention where petitioner was being held in connection with that charge. According to Crabb, while petitioner was in detention he phoned Crabb twice asking to see him. H–33–34. Crabb testified that he got permission from his commanding officer and conferred with the district attorney's office before visiting petitioner. H 38–39.

When Crabb arrived at the Brooklyn House of Detention, he was locked in a cell alone with petitioner, who signed a form consenting to the visit. H–19. After some opening pleasantries petitioner began to talk to him about the Gathers case, and Crabb responded that he could not discuss that crime because petitioner had already been indicted. H–20. Then Crabb told petitioner he wanted to talk about the Hill homicide. H–20. When petitioner agreed, Crabb read him his Miranda rights. H–20. According to Crabb, petitioner then asked what Crabb would be able to do for him, and Crabb explained that he could not do anything personally, that it was up to the district attorney's office. H–21–22. At that point, Crabb testified, petitioner proceeded to give him the information that Crabb later typed as the statement. H–22. Asked at the trial whether he had ever suggested that petitioner write out or initial his statement, he said that he had not. T–710. Such a suggestion would seemingly have been pointless because, while Crabb was making notes of petitioner's statement, petitioner asked what he was doing and then told Crabb that he could never go to court with the statement because petitioner would deny it. T–713.

Petitioner challenged the statement he allegedly made to Detective Crabb on the grounds that "there has not been a showing beyond a reasonable doubt that a voluntary statement or admission or confession was made," that petitioner had not been properly Mirandized, and that the detective spoke with him in violation of his Sixth Amendment right to counsel. H–64. At the conclusion of the hearing, the judge ruled that there was no Miranda violation because the detective did not initiate the conversation leading to the statement. H–

74. Regarding the right-to-counsel claim, the judge held that "[t]he fact that [petitioner] is represented by counsel in one matter does not preclude a police officer from speaking to him on an unrelated matter." H–75. Denying the suppression motion, the judge concluded that "the oral statement made by the defendant to the detective was voluntarily made, initiated by the defendant himself and also that his Sixth Amendment Constitutional rights as well as the Fifth Amendment Constitutional rights were not violated at all." H–75–76.

On January 10, 1977 a *Wade* hearing was held to determine the admissibility of identification testimony. Arthur Shiloh, Vincent Cooke, and Detective Anthony Martin testified. Cooke testified that when he viewed the lineup, petitioner "appeared to be the one that I remember in the bar. And I could tell from his, you know—his coat is another thing. He had on a leather coat that I remembered." W–165. When asked later in the Wade Hearing, "What was the basis for your picking out Mr. Whitaker," Cooke responded, "His face." W–166. The prosecutor followed up: "What were you thinking back to when you made the identification?" Cooke answered, "How he looked like the man that I saw in the bar. And the clothes. You know, he had on the same clothes. I looked at the round face." W–166. During cross-examination, Cooke was pressed to say whether there was anything "peculiar about the face that stuck in his mind." W–185–186. He responded again that the face was "round" and added that there was something "different" about the eyes, that "stood out." W–186. Asked whether he was "absolutely sure" when he picked petitioner out of the lineup, he replied, "Well, after I picked him out, I was convinced." W–184.

Arthur Shiloh explained that, having failed to identify anyone on his first viewing of the lineup, and having asked to see the lineup again, on his second viewing, "the black leather coat really set if off for me." W–147. At that point the hearing judge asked Shiloh whether the coat was "the sole basis" for his identification of petitioner, and Shiloh at first responded, "Yes." W148–149. The following colloquy then ensued:

Court: The only basis?

Shiloh: Yes.

Court: Not the face and the features?

Shiloh: The feature and the face and the black leather jacket.

Court: What I asked you was it only the black leather coat. If somebody else in that lineup, number 5 let's say was wearing a neat black leather coat, and Whitaker was not wearing a black leather coat, would you have picked him out?

Shiloh: Yes. By the face.

Court: Would you have picked him out?

Shiloh: Yes.

W–149.

At the close of the hearing, the judge denied the suppression motion. Regarding the lineup, he explained that Cooke "made the identification from his eyes and round face as well as a black leather coat." W–258. The judge also noted that "Shiloh stated that he made his identification from the face, but it was the black leather coat that convinced him it was the defendant." W–258.

The judge concluded,

I cannot under any stretch of the imagination see how this was an unfair lineup. First of all, it wasn't for the purpose of identifying the defendant to begin with. It was for the purpose of attempting to identify someone else as the perpetrator.

Second, there was no testimony whatsoever that I heard of where anybody suggested or made any undue suggestions to any of the persons who viewed the lineup and I find the lineup was a proper lineup and as far as that argument of being an unfair lineup is concerned, I do not believe that it holds any water whatsoever.

W–260. There were no other findings of fact made by the trial judge.

Petitioner was then tried and convicted of murder in the second degree, three counts of robbery in the first degree, and criminal possession of a weapon in the second degree. At trial, the identification testimony of Cooke and Shiloh, and Detective Crabb's testimony about the confession, was substantially the same as their testimony at the pretrial hearings. Petitioner's conviction was reversed based on a retroactive application of *People v. Rogers,* 48 N.Y.2d 167, 422 N.Y.S.2d 18, 397 N.E.2d 709 (1979), decided two years after the trial, which held that a defendant represented by counsel in a criminal case may not be interrogated in the absence of his attorney, even on unrelated charges. *People v. Whitaker,* 75 A.D.2d 111, 428 N.Y.S.2d 691 (1980). The order denying the motion to suppress the eyewitness identification was affirmed, thus making a retrial possible.

Petitioner was retried, this time without testimony about his alleged admissions to Detective Crabb. At the second trial, Arthur Shiloh and Vincent Cooke again testified about the crime and their identifications of petitioner in the lineup. They also identified him in court. Winfred Moore and Samuel Hayward testified about the events at the Moulin Rouge, but were unable to identify petitioner. Petitioner was again convicted of murder in the second degree, three counts of robbery in the first degree, and one count of criminal possession of a weapon in the second degree. He was sentenced on April 6, 1981 to a term of 25 years to life on the murder count, a concurrent term of 5 to 15 years for the weapon possession, and three terms of 8 ⅓ to 25 years on the robbery counts, concurrent with each other, but consecutive to the sentence for murder.

On October 31, 1983, the Appellate Division modified the sentence to run the robbery sentences concurrently with the murder sentence and affirmed the conviction as modified. *People v. Whitaker,* 97 A.D.2d 555, 468 N.Y.S.2d 168 (2d Dept. 1983). Petitioner appealed to the New York Court of Appeals, which affirmed, noting that petitioner challenged the lineup on several grounds, but asserting that "the only issue which is within the scope of our review is his contention that using him as a filler in a lineup without his consent constituted an illegal seizure," an argument it rejected. 64 N.Y.2d 347, 351, 486 N.Y.S.2d 895, 897, 476 N.E.2d 294 (1985). The Court of Appeals explained that the "determination that the lineup was not suggestive involves a mixed question of law and fact which is supported by the record and thus is beyond review in this court." *Id.* at n. *. A petition for a writ of certiorari was denied. *Whitaker v. New York,* 474 U.S. 830, 106 S.Ct. 95, 88 L.Ed.2d 77 (1985). Eleven years later, Abdur–Raheem filed this petition for a writ of habeas corpus.

### Discussion

Petitioner contends that his conviction must be reversed because it was based on an identification that was unduly suggestive and unreliable and thus violated his due process rights under the 14th Amendment. As part of his right to due process, a criminal defendant has the right not to be subjected to suggestive police identification procedures that create a "very substantial likelihood of irreparable misidentification." *Manson v. Brathwaite,* 432 U.S. 98, 116, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140 (1977); quoting *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968).[3] Not all

**3.** Some five years before *Brathwaite,* in *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), the Supreme Court explained that the standard articulated in *Simmons,* "a very substantial likelihood of irreparable misidentification," was the "standard

for determining whether an in-court identification would be admissible in the wake of a suggestive out-of-court identification," and that in determining "the admissibility of testimony concerning the out-of-court identification itself," the standard should be modified

suggestive identification procedures, however, raise a constitutional issue. First, the challenged procedure must be "unnecessarily suggestive." *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967). Moreover, even unnecessary suggestiveness in and of itself does not violate due process. *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972). "[T]he primary evil to be avoided is a very substantial likelihood of irreparable misidentification." *Id.*, 93 S.Ct. at 381 (internal quotations omitted). Thus, the "central question" is "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Id.* at 199, 93 S.Ct. at 382.

■ The first question, then, is whether the line-up that included petitioner was suggestive. It was. Petitioner was the only person in the lineup who was wearing a black leather coat. All the witnesses who viewed the lineup had noticed that the man who shot Charles Hill was wearing a black leather coat and reported this to the police at the time of the robbery. W–130, 182, 233; T2–214. Moreover, it appears from the witnesses' testimony at the *Wade* hearing that the coat was a decisive factor in their identifications. Vincent Cooke specifically mentioned that he remembered the coat. W–165. He explained that he found petitioner's eyes and face distinctive, but he also relied on the fact that petitioner "had on the same clothes" as the shooter in the bar. W–166. The hearing judge found that Cooke "made the identification from his eyes and round face as well as a black leather coat." W–258. As for Arthur Shiloh, although the hearing judge managed to elicit that his identification was based partly on petitioner's face and features, it is clear that the coat was a significant factor. Shiloh began by stating that "the black leather coat really set it off for me." W–147. Indeed, the hearing judge acknowledged in his findings, which are presumptively correct, 28 U.S.C. § 2254(e)(1), that "Shiloh stated that he made his identification from the face, but it was the black leather coat that convinced him it was the defendant." W–258. Based on this record the lineup was suggestive.

■ I put aside for the moment the question whether the lineup was "unnecessarily suggestive" and the relevance of the fact that the eyewitness identification was not the product of deliberate police misconduct. While I will return to this question at a later point, I first address the central issue whether the suggestively obtained identifications were otherwise admissible. The five factors specifically identified in *Biggers* and *Brathwaite* as being included among those relevant to the admissibility of suggestive identifications are "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Brathwaite*, 432 U.S. at 114, 97 S.Ct. at 2253, citing *Biggers*, 409 U.S. at 199–200, 93 S.Ct. at 382. Thus, the admissibility determination begins with an analysis of those aspects of the challenged identifications.

*Opportunity to View*

The opportunities of the witnesses to observe the robbers in the Moulin Rouge may be divided into two periods, before and after the shooting. The pre-shooting period extends from the three strangers' appearance at the bar until the time one of them shot Charles Hill. Witness estimates

---

by deleting "irreparable." *Id.* at 198, 93 S.Ct. at 381. *Brathwaite* involved both testimony about a suggestive pretrial identification and an in-court identification. The issue presented in *Brathwaite*, however, as framed by the Court, concerned only the admissibility of pretrial identification evidence. 432 U.S. at 99, 97 S.Ct. at 2245. In light of *Biggers*'s discussion, it is somewhat puzzling that the *Brathwaite* Court, in analyzing the pretrial identification, applied the test from *Simmons*, complete with the "irreparable" modifier. In petitioner's case, both pretrial and in-court identifications are at stake.

of the length of this time period ranged from ten to thirty minutes. W–84, 160; T2–119, 173, 207. Arthur Shiloh described the lighting conditions in the bar as "pretty fair," W–83, and asserted that the lights were on and he could see. T2–64. Vincent Cooke, on the other hand, said that the lighting was "kind of dim." W–161. Apparently Cooke was wearing dark glasses at the time of the robberies. W–189.

After the shooting, Arthur Shiloh did not have any further opportunity to observe the shooter. At the *Wade* hearing, he explained that another man held a gun on him and that during this time he never looked over to see what the shooter was doing. W–120–121. He stated flatly at the hearing that he only saw the shooter "when he was in the bar talking to Charlie." W–122. Vincent Cooke testified that he was able to see the shooter immediately after the shooting:

> He backed away from Charlie, Charlie fell to the floor. He backed away. And while the shot was fired, I mean I wasn't staring at him. Then I just turned to see, you know, what happened, seen him fall. I seen the gun in his hand, and then the other fellow that had the gun that was standing closer to us, he pulled the gun and told us to put our hands on the bar.

W–161–162.

Cooke said that he had another chance to observe the shooter, when, after the witnesses had been herded into the bathroom by the robbers, the shooter appeared at the bathroom door asking which key fit Winfred Moore's car. W–162. At trial, however, Moore denied that the shooter had ever come back to the bathroom. T2–215.

*Degree of Attention*

The witnesses' attentiveness may have been affected somewhat by their alcohol consumption. When the robbers arrived, Arthur Shiloh was working on his third scotch of the evening and Cooke was having his second. W–110, 189–190. At the

*Wade* hearing, Shiloh described how he looked up from the football game, looked out the window, and saw three men approaching the Moulin Rouge. W–83. When the three strangers arrived, Shiloh "[j]ust glanced at them." W–83. He did observe their movements, however:

> One stood by the window as they was coming into the door. Two went to the bathroom. When the two came out of the bathroom, they stopped about the middle of the bar—not the middle of the bar, three quarters way . . . .

W–84.

Cooke also looked at the strangers when they entered and noticed that two walked to the bathroom at the back of the bar while one remained up front. W–157. He described his observations of the men after they returned from the bathroom:

> Everybody was looking at the football game and I seen, I think [the shooter] went over to Charlie and said something. . . . I remember looking and glancing. There was no argument or nothing, you know. I thought it was about the football game probably, because it looked like they were smiling. So I assumed that everything was all right and I forgot about it, you know, about the three guys, because I was busy talking to Shiloh and Winnie.

W–158–159.

At that point, Shiloh also lost interest in the three strangers, and whatever concerns their arrival caused apparently dissipated:

> [T]hey started talking to Charles Hill and they were looking at the football game. So, I didn't pay no attention and I kept on watching the football game. As I was talking to Vincent and they were all laughing and talking and watching the football game, and after that, I looked over again and they were talking again. I assumed they were speaking of the football game and I assumed he knew the fellows and after that, I relaxed and I was still watching.

Next thing I know, pow!

W–84.

After the shooting, Shiloh never looked at the shooter at all. W–119–122. Cooke watched the shooter as he backed away from Charles Hill. W–161. Shortly afterwards, however, he was distracted by the second gunman's command to put his hands on the bar. W–162. Of course, after the shooting the killer was holding a gun. Moreover, the second gunman held up the witnesses. Experts have confirmed the rather obvious fact that if someone is brandishing a gun at you, your mind is likely to be focused on the gun and not on the facial features of the people involved. See *United States v. Burrous*, 934 F.Supp. 525, 527 (E.D.N.Y.1996). Indeed, both Shiloh and Cooke misidentified a photograph of the person who held a gun on them. T2–141–146, 197–199, 271–275.

*Accuracy of Prior Description*

The record is silent regarding the accuracy or inaccuracy of Shiloh's and Cooke's descriptions of the shooter.

*Level of Certainty*

On this issue, Shiloh's identification speaks for itself. He viewed the lineup for two or three minutes, told Detective Martin that no one in the lineup looked familiar to him, and left the lineup room. W–140–141. Detective Martin testified that when Shiloh viewed the lineup for a second time, he identified petitioner as someone who "strongly resembles the person who shot Charles Hill," W–240, but Shiloh testified that he didn't think he had used the word "resemble": "I said number one is the man, that's what I said." W–147. Asked whether there was any doubt in his mind when he made his second identification, Shiloh testified:

Everybody have a little doubt, but I said that was the man, O.K.

Q: But you weren't absolutely sure?

A: Not positive, but I said that was the man, really … face features of him the black leather coat, the same

thing, the black leather coat really set if off for me.

W–147.

According to Detective Martin, "Vincent Cooke viewed the lineup and said number one. I said how sure are you of it. He said if it isn't him, it's nobody." W–220. Cooke's testimony about the lineup, however, was a bit more equivocal. Asked whether he was "absolutely sure" when he made the identification, he replied, "Well, after I picked him out, I was convinced." There follows this colloquy:

Q: You were convinced?

A: Yes.

Q: Was there some doubt left?

A: If I was convinced, there can't be any doubt left.

Q: So, you are saying you are absolutely sure.

A: After I pointed him out.

W–184–185.

*Time Between Crime and Confrontation*

Twenty days elapsed between the robbery at the Moulin Rouge and the lineup. While that does not create the sort of memory drain that occurs with the passage of years, neither is it an immediate post-crime identification.

Summing up the effect of these factors, then, it appears that the witnesses had an opportunity to view the robbers for some minutes before the crime, and were somewhat attentive to them, at least initially. The witnesses had been drinking, however, and were distracted by the football game they were watching and their conversation with each other. Once the shooting took place, they had little opportunity to see the shooter's face and were immediately or quickly distracted by the second gunman. There is no evidence one way or the other regarding the accuracy of their subsequent descriptions of the shooter, and the time between the shooting and the confrontation was not long or short enough to be a significant factor. Finally, and most important, one of the witnesses was so uncer-

tain at the confrontation that he initially declined to make an identification and only did so after he learned that another person had picked someone out of the lineup as the shooter. Considering these factors alone, the identifications simply do not appear solid enough to outweigh "the corrupting effect of the suggestive identification itself," *Brathwaite,* 432 U.S. at 114, 97 S.Ct. at 2253, especially given that both witnesses acknowledged that the suggestive coat was a factor in their identifications.

■ The factors set out in *Brathwaite,* however, do not exhaust the possible ways in which identification evidence may prove to be reliable or unreliable. Indeed, the Supreme Court was careful to say that the factors to be considered "include" the ones named. *Brathwaite,* 432 U.S. at 114, 97 S.Ct. at 2253. In my view, another critical factor should be taken into account before an otherwise unassailable jury verdict is set aside in a collateral proceeding: the evidence or lack of evidence that the petitioner is guilty of the crime of which he has been convicted. This sixth factor goes to the heart of the Supreme Court cases that initially addressed the problem posed by eyewitness identifications. Those cases developed out of concerns that eyewitness identifications (by strangers) are not reliable, that juries could not be trusted to evaluate the deficiencies of such apparently compelling evidence, and that the admission of suggestive identifications risked the ultimate injustice—the conviction of an innocent person. In short, the reason the Court involved itself in the first place with suggestively obtained identifications was the recognition that they were a "major factor contributing to the high incidence of miscarriage of justice." *United States v. Wade,* 388 U.S. 218, 228, 87 S.Ct. 1926, 1933, 18 L.Ed.2d 1149 (1967), *Stovall v. Denno,* 388 U.S. 293, 297, 87 S.Ct. 1967, 1970 (1967) ("A conviction which rests on a mistaken identification is a gross miscarriage of justice.").

The historical backdrop against which these cases were decided need not be reviewed at length. Steven P. Grossman sums up the empirical evidence that precipitated the Court's regulation of eyewitness testimony:

> Observers of the American system of criminal trials have long been aware of the danger of wrongful convictions because of a witness' misidentification. Edward Borchard, in his 1932 book, *Convicting the Innocent,* detailed numerous cases of people, later shown to be innocent, being tried and convicted of crimes. After analyzing the causes of these mistaken convictions, Borchard concluded that misidentifications by victims were the prime cause of wrongful convictions. Judge Jerome Frank, some years later, undertook a similar investigation and arrived at the same conclusion. Although the possibility of erroneous convictions cannot be prevented, nothing is more fundamental to our system of justice than the need to minimize these tragedies.

"Suggestive Identifications: The Supreme Court's Due Process Test Fails to Meet Its Own Criteria," 11 Baltimore L.Rev. 53, 65 (1981). In *Wade,* Justice Brennan cited the Borchard and Frank studies as support for the underlying assumption in the *Wade, Gilbert, Stovall* trilogy that "the annals of criminal law are rife with instances of mistaken identification." *Wade,* 388 U.S. at 228, 87 S.Ct. at 1933.

If the reason for ousting the jury from its historic role of evaluating evidence is our concern with such miscarriages of justice, then surely other evidence that strongly persuades us that a defendant is guilty supports allowing the jury to consider a questionable identification. Conversely, the absence of corroborating evidence may be relevant in the ultimate determination of the admissibility of identification evidence. *See Jackson v. Fogg,* 589 F.2d 108, 112 (2d Cir.1978) (noting that of "all the various kinds of evidence" testimony of eyewitnesses "is the least reliable, espe-

cially where unsupported by corroborating evidence").

In his James Madison Lecture on reasonable doubt, then-Chief Judge Newman argued that corroboration should be required in cases that rest on the testimony of a single eyewitness who "did not previously know the accused and had only a brief opportunity to observe him." Jon O. Newman, "The Madison Lecture: Beyond 'Reasonable Doubt'," 68 N.Y.U. L.Rev. 979, 999 (1993). Judge Newman suggested that, when corroboration is lacking, "courts should face up to their responsibilities and rule that, though there is some evidence of guilt, it is insufficient to persuade a reasonable jury by the high standard of proof beyond a reasonable doubt." *Id.* The rule he suggests may be problematic because it could preclude a jury from considering the only available relevant evidence. *See* Jerome Frank and Barbara Frank, *Not Guilty* 63 (1957) (A rule that would "[n]ever allow a single witness to give testimony, at the trial, identifying the accused, but always require that at least one other witness corroborate such testimony" has the "obvious weakness" that in a case where no one was present but the perpetrator and his victim, "no criminal could be convicted if the victim could not, in court, testify as to the identity of the accused.") The fact that it may be too much to require corroboration for *all* identifications, however, does not mean that we should ignore its importance altogether. As both Judges Newman and Frank recognize, corroboration is a valid factor in establishing the reliability of eyewitness identifications.

██ The corroboration rule I suggest here for eyewitness identification testimony would not preclude a conviction based on uncorroborated eyewitness testimony. Instead, it would only bar the admission of uncorroborated identification testimony when the totality of circumstances indicated that there was a significant risk of misidentification. Where corroboration was present, the jury would be permitted to determine the weight to be accorded to an otherwise questionable identification that had been suggestively obtained. Such a rule shows appropriate deference to the judicial process of the states, and to the central role of the jury as the finder of fact. It is also consistent with the current practice of many courts, although that practice has not yet achieved recognition as a sixth factor in the admissibility analysis of identification evidence

Most important, the proposed rule provides greater insurance against the conviction of an innocent person than a test that focuses exclusively on the *Biggers–Brathwaite* factors, which has been almost universally criticized as inadequate. *See* Charles A. Pulaski, *"Neil v. Biggers:* The Supreme Court Dismantles the *Wade* Trilogy's Due Process Protection," 26 Stan. L.Rev. 1097 (1974) (suggesting that the *Biggers* test is so easily satisfied that the due process protection it provides is probably no greater than what already existed before *Stovall* ). The value of at least two of the factors—accuracy of the witness' prior description and certainty at the confrontation—has been seriously questioned. Based on empirical research into eyewitness identifications, these factors "assign too much predictive value to eyewitness confidence and also to witnesses' descriptions, neither of which is very predictive of identification accuracy in scientific studies." Ronald P. Fisher, "Interviewing Victims and Witnesses of Crime," 1 Psychol. Pub. Pol'y & L. 732, 736 (1995).[4] Moreover, psychologists who study memory and perception agree that numerous other fac-

---

4. The Second Circuit recently acknowledged that criticism of the witness confidence factor "may indeed have been scientifically reliable," yet upheld the exclusion of expert testimony that would have brought it to the attention of the jury. *United States v. Lumpkin,* 192 F.3d 280, 289 (2d Cir.1999) (testimony based on scientifically reliable articles regarding weak relationship between certainty and accuracy of identification was properly excluded because it "would have confused the jury's assessment" of witness credibility).

tors can affect a witness' ability to make an accurate identification, including the violence of the event witnessed, the presence of a weapon, and the witness' expectations based on cultural biases and past experience. David M. Shofi, "The New York Courts' Lack of Direction and Discretion Regarding the Admissibility of Expert Identification Testimony," 13 Pace L. Rev 1101, 1105–07 (1994); Elizabeth F. Loftus, *Eyewitness Testimony* 31–51, 136–42 (1979). *See also,* Randolph N. Jonakait, "Reliable Identification: Could the Supreme Court Tell in Manson v. Brathwaite?" 52 U. Colo. L.Rev. 511 (1981); Gerald F. Uelmen, "Testing the Assumptions of *Neil v. Biggers:* An Experiment in Eyewitness Identification," 16 Crim. L. Bull. 358 (1980).

Rather than relying solely on the five specific factors outlined in *Brathwaite,* a sixth factor that looks to corroborating evidence of guilt provides an essential protection against the "gross miscarriage of justice" that can result from "[a] conviction which rests on a mistaken identification." *Stovall,* 388 U.S. at 297, 87 S.Ct. at 1970. As one commentator has observed, the ultimate question of an identification's reliability—as with any piece of evidence—is dependent in part on the existence of corroborating proof that the defendant is the one who committed the crime:

> At root, the accuracy of the determination of identity in criminal cases depends on redundance. In most cases in which the identity of the criminal is in dispute there are multiple, independent sources of information pointing to a single suspect. Errors can occur in such cases ..., but they are rare. When the identification depends on a single type of evidence, however, mistakes are much more likely.
>
> The redundance that counts is not between one eyewitness and another but between different types of evidence of identity.

Samuel R. Gross, "Loss of Innocence: Eyewitness Identification and Proof of Guilt," 16 J. Legal Studies 395, 432–33 (1987).

It is true that in *Brathwaite* itself there is language that can be read to oppose the use of other evidence of guilt to establish the reliability of eyewitness identifications. After analyzing the record in light of the five factors articulated in *Biggers,* Justice Blackmun concluded that "[t]hese indicators of [the witness's] ability to make an accurate identification are hardly outweighed by the corrupting effect of the challenged identification itself." *Brathwaite,* 432 U.S. at 116, 97 S.Ct. at 2254. Justice Blackmun then continued,

> Although it plays no part in our analysis, all this assurance as to the reliability of the identification is hardly undermined by the facts that respondent was arrested in the very apartment where the sale had taken place, and that he acknowledged his frequent visits to that apartment.

*Id.* Justice Blackmun did not explain why the corroborating evidence played no role in the analysis in *Brathwaite,* nor did he say that such evidence could never play a role in the decision whether to admit eyewitness identifications.

Some explanation for the puzzling manner in which Justice Blackmun dealt with the issue of corroboration may be found in Judge Friendly's opinion for the Second Circuit in *Brathwaite,* which was reversed by the Supreme Court. Judge Friendly took a different view of the reliability of the eyewitness identification when weighed against the five *Biggers–Brathwaite* factors. At the time of *Brathwaite,* however, it was the clear rule in the Second Circuit that independent evidence corroborating an identification could provide the basis for admitting an otherwise questionable identification. *United States v. Reid,* 517 F.2d 953, 967 (2d Cir.1975). Such evidence was present in *Brathwaite,* corroborating the blatantly suggestive eyewitness identification: An undercover police officer had purchased drugs from Brathwaite at an apartment, and there was other evidence linking

the defendant to that same apartment. Judge Friendly, concluded, however, that this evidence was not strong enough to sustain the admissibility of the eyewitness identification. As he explained,

> Perhaps the strongest bit of evidence to strengthen the identification was Brathwaite's arrest in the very apartment where the sale was made. But Brathwaite offered an explanation of this which was not implausible, although evidently not credited by the jury ....

*Brathwaite v. Manson*, 527 F.2d 363, 372 (2d Cir.1975). These circumstances may explain Justice Blackmun's unwillingness to rely on the corroborating evidence other than to say, quite consistently with Judge Friendly's analysis, that it did not undermine the reliability of the identification in this case, although it did not enhance it. Of course, this is speculation. What is clear, however, is that the majority of the Supreme Court in *Brathwaite* did not expressly hold that the presence of corroboration could not be considered.

Perhaps recognizing that the Blackmun opinion in *Brathwaite* was ambiguous, Justice Stevens wrote a separate concurrence, which was not joined by any of the other six members of the *Brathwaite* majority. Justice Stevens first commended Justice Blackmun's opinion for avoiding what he characterized as "the pitfall" of considering other evidence of guilt. *Brathwaite*, 432 U.S. at 118, 97 S.Ct. at 2255 (Stevens, J., concurring). He then went on to expressly articulate the view that corroborating evidence should not "be considered to support the admissibility of eyewitness testimony when applying the criteria identified in *Neil v. Biggers*." 432 U.S. at 118 n. *, 97 S.Ct. at 2259 n. *. "Properly analyzed," he continued, "such facts would be relevant to a question whether error, if any, in admitting identification testimony was harmless." *Id.*

While the Stevens opinion clearly says what Justice Blackmun avoided saying, it fails to set out the reasons for the rule it advocates, and seems somewhat inconsis-

tent with the view expressed earlier in the concurrence. There, Justice Stevens suggested that "the Federal constitution does not foreclose experimentation by the States in the development of ... rules" to "minimize the danger of convicting the innocent on the basis of unreliable eyewitness testimony." *Brathwaite*, 432 U.S. at 117–18, 97 S.Ct. at 2254–55 (Stevens, J., concurring). Surely, such experimentation could encompass a rule making the admissibility of questionable eyewitness identifications turn on corroborative evidence that suggests that the eyewitness identification is not mistaken and that the defendant is not innocent. Since the Supreme Court applies such a rule of corroboration to the admissibility of confessions—and for reasons similar to its concern about the reliability of eyewitness identifications—it seems improbable that the Court would disapprove such a rule for determining the admissibility of identification evidence.

Indeed, corroboration is recognized widely as a way to address concerns about the reliability of evidence. "The law views some witnesses and some forms of evidence with skepticism, and therefore often demands corroboration as a matter of fairness to the defendant."William Payson Richardson & Jerome Prince, *Prince, Richardson on Evidence*, § 3–207 at 111 (Richard T. Farrell ed., 11th ed. 1995). In federal courts, as noted above, corroboration is mandated for confessions and admissions, in a version of the old common law "corpus delicti" rule. *See Smith v. United States*, 348 U.S. 147, 152–54, 75 S.Ct. 194, 197–98, 99 L.Ed. 192 (1954); *Opper v. United States*, 348 U.S. 84, 91–93, 75 S.Ct. 158, 163–64, 99 L.Ed. 101 (1954). Corroboration of an informant's tip can provide the basis for reasonable suspicion to justify an investigatory seizure by police, *see Alabama v. White*, 496 U.S. 325, 331, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990), and it is also a relevant factor in the determination of probable cause based on an informant's tip. *Illinois v. Gates*, 462 U.S. 213, 237–44, 103 S.Ct. 2317, 2332–

35, 76 L.Ed.2d·527 (1983); *Draper v. United States,* 358 U.S. 307, 310–13, 79 S.Ct. 329, 331–33, 3 L.Ed.2d 327 (1959). Similarly, Fed.R.Evid. 804(b)(3) requires a showing of corroboration before declarations against penal interest may be offered to exculpate the accused.

New York also requires corroborative evidence for both confessions, N.Y. Criminal Procedure Law § 60.50, and declarations against penal interest, *People v. Thomas,* 68 N.Y.2d 194, 197, 507 N.Y.S.2d 973, 975, 500 N.E.2d 293 (1986), as well as demanding corroboration for accomplice testimony, unsworn testimony of witnesses too young or too mentally deficient to understand the significance of an oath, and in prosecutions for certain offenses, including some sex offenses, perjury, criminal possession of stolen goods, and criminal facilitation. *Prince, Richardson* § 3–207(b)–(g) at 111–16. Numerous state statutes require corroboration before the hearsay statements of a child declarant may be admitted. *See Idaho v. Wright,* 497 U.S. 805, 829 n. 2, 110 S.Ct. 3139, 3154 n. 2, 111 L.Ed.2d 638 (1990) (Kennedy, J. dissenting). New York and other states likewise require corroboration before evidence is admissible under some common law exceptions to the hearsay rule. *See, e.g., People v. Brown,* 80 N.Y.2d 729, 735–36, 594 N.Y.S.2d 696, 700–01, 610 N.E.2d 369 (1993) (present sense impression).

*Idaho v. Wright,* 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), does not undermine the propriety of the corroboration rule proposed here. In that case, a 5–4 majority held that particularized guarantees of trustworthiness required to establish the reliability of a child's hearsay statement of sexual abuse could not be satisfied by independent evidence establishing the truth ·of the hearsay declaration. *Id.* 497 U.S. at 822–23, 110 S.Ct. at 3150; *see also Lilly v. Virginia,* 527 U.S. 116, 119 S.Ct. 1887,1900–01, 144 L.Ed.2d 117 (1999). In *Wright,* however, the Supreme Court was applying the Confrontation Clause, a provision of the Constitution that prescribes a specific mechanism—confrontation and cross-examination—for testing the trustworthiness of testimonial evidence. *See Ohio v. Roberts,* 448 U.S. 56, 65, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 ( the "underlying purpose" of the Confrontation Clause is "to augment accuracy in the factfinding procéss by ensuring the defendant an effective means to test adverse evidence"). In that context, before admitting evidence without cross-examination, the circumstances under which the statements were made must be determined to be "so trustworthy that [such] adversarial testing would add little to their reliability." *Wright,* 497 U.S. at 821, 110 S.Ct. at 3149. In contrast, the eyewitness identification cases involve a judicially created rule to prevent an unjust conviction. While the rule may be rooted in the Due Process Clause, it is not a specifically prescribed rule that should preempt variations that are equally, or more, effective in achieving the same purpose. *Cf. Wade,* 388 U.S. at 239, 87 S.Ct. at 1938–39.

Moreover, there is a significant aspect of *Brathwaite* that provides affirmative support for a rule which takes other evidence of guilt into account in determining the admissibility of questionable eyewitness identifications. I refer to yet another concurring opinion, not by a Justice of the Supreme Court, but by Judge Harold Leventhal of the Court of Appeals for the D.C. Circuit, in *Clemons v. United States,* 408 F.2d 1230 (D.C.Cir.1968). The significance of the Leventhal concurrence in *Clemons,* which will presently be discussed, is that its reasoning was expressly adopted by Justice Blackmun in *Brathwaite.* The issue addressed by the D.C. Circuit in *Clemons* was the remedy to be employed in cases involving suggestive identifications that took place prior to *U.S. v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). By way of background, it may be recalled that *Stovall* asserted that the Due Process Clause could be offended by the admission of an unduly suggestive identification and was the first occasion on which

the Supreme Court gave "notice that the suggestiveness of identification procedures was anything other than a matter to be argued to the jury." *Biggers,* 409 U.S. at 199, 93 S.Ct. at 382.

Oddly, *Brathwaite* involved the converse of *Clemons*—an unnecessarily suggestive identification after it was clear that such identifications implicated the Due Process Clause. Nevertheless, in rejecting a per se rule that would preclude the admissibility of eyewitness identifications that were preceded by such suggestive confrontations, Justice Blackmun cited Judge Leventhal's analysis as "correctly" describing the due process right articulated in *Stovall* "as protecting an evidentiary interest" and "as recognizing the limited extent of that interest in our adversary system." *Brathwaite,* 432 U.S. at 113, 97 S.Ct. at 2252.

In language quoted approvingly by Justice Blackmun in *Brathwaite,* Judge Leventhal wrote:

> In essence what the Stovall due process right protects is an evidentiary interest. . . .

> It is part of our adversary system that we accept at trial much evidence that has strong elements of untrustworthiness—an obvious example being the testimony of witnesses with a bias. While identification testimony is significant evidence, such testimony is still only evidence, and, unlike the presence of counsel, is not a factor that goes to the very heart—the 'integrity'—of the adversary process.

> Counsel can both cross-examine the identification witnesses and argue in summation as to factors causing doubts as to the accuracy of the identification—including reference to both any suggestibility in the identification procedure and any countervailing testimony such as alibi.

*Clemons,* 408 F.2d at 1251 (internal footnote omitted) (quoted in *Brathwaite,* 432 U.S. at 113 n. 14, 97 S.Ct. at 2252 n. 14).

Judge Leventhal's opinion in *Clemons* goes on to explain:

> Since the interest protected is in essence an evidentiary one, denial of the retroactive right recognized in Stovall and explained in Simmons [v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) ] must depend on the assessment of all the factors bearing on the identification issue. The presence of other untainted identification testimony, counsel's opportunity to inquire into the circumstances of the challenged identification, and to bring out the facts, are all relevant to the consideration of overall due process fairness to the accused.

408 F.2d at 1251.

Most tellingly, immediately leading up to the section of *Clemons* quoted in *Brathwaite,* Judge Leventhal argued that it is

> appropriate—particularly in cases where the trial as well as the identification preceded Wade, Gilbert and Stovall—that the court assess not only the 'totality of circumstances' surrounding the challenged identification, but also the totality of circumstances at trial concerning the issue of identification, i.e. the totality of proof and other factors bearing on the likelihood of misidentification. The mere fact that some 'unreliable' identification testimony was received does not establish a denial of the due process right to a fair trial.

*Id.* at 1250. Judge Leventhal's opinion then sets out the rationale for broadening the due process inquiry to include the "totality of proof":

> The soundness of making a due process right depend on a review of evidence becomes clear when one focuses on the interests protected retroactively by the Simmons–Stovall due process right. Unlike the interests preserved by the guarantee of counsel or some of the other specific guarantees, the interests guarded by Stovall cannot so easily be

factored out and assessed independently of the evidence.

*Id.* at 1251(internal footnote omitted).

The cases since *Brathwaite* continue to reflect the reality recognized by Judge Leventhal that "the interests guarded by Stovall cannot so easily be factored out and assessed independently of the evidence." Thus many courts have continued to consider other proof of guilt in deciding whether to admit eyewitness identification testimony. As the Eighth Circuit put it, "it seems unnatural to set such evidence aside when one considers that the ultimate purpose of the *Biggers* factors is to avoid eyewitness testimony where there is 'a very substantial likelihood of irreparable misidentification'." *Graham v. Solem,* 728 F.2d 1533, 1546 (8th Cir.1984) (en banc).

Several courts have explicitly analyzed other evidence of guilt to decide the admissibility of challenged identifications. A First Circuit case authored by then-Judge Breyer relied in part on corroborative evidence of guilt in holding that an eyewitness identification was properly admitted. *United States v. Lau,* 828 F.2d 871, 875 (1st Cir.1987).[5] The corroboration in that case included evidence that one defendant had a license to fly the type of plane used in the crime and another was nearby at the time of the incident. Judge Breyer went through the *Biggers–Brathwaite* factors for and against a correct identification—the witness's confidence in his identifications, opportunity to observe, accuracy

of prior descriptions, and the time elapsed between the incident and the identification. *Id.* The corroborating evidence appears as part of this same analysis, as one of the "factors [that] weigh in favor of a correct identification." *Id.*

Similarly, in evaluating the reliability of eyewitness identifications in a drive-by shooting, the Seventh Circuit explained that "[c]orroborated eyewitness testimony is much less suspect than one individual's visual impression." *United States ex rel. Kosik v. Napoli,* 814 F.2d 1151, 1156 (7th Cir.1987). The Seventh Circuit then proceeded to consider, along with the *Biggers–Brathwaite* factors, that a car like the one eyewitnesses described was registered to the defendant, that two other witnesses who did not make identifications gave descriptions of the driver that fit the defendant, and that the shooting took place in the defendant's neighborhood. *Id.* at 1156–57, 1161. An in-court identification was likewise judged reliable by the Eighth Circuit, in part because two other government witnesses identified the defendant, including the driver of the getaway car. *United States v. Rogers,* 73 F.3d 774, 778 (8th Cir.1996). As the panel explained, the "additional testimony diminishes any likelihood of irreparable misidentification." *Id.; see also United States v. Wilkerson,* 84 F.3d 692, 695 (4th Cir.1996) ("Courts may also consider other evidence of the defendant's guilt when assessing the reliability of the in-court identification").[6]

---

**5.** The identification issue in *Lau* arose not as a due process challenge to eyewitness identification of the defendants as perpetrators of the crimes with which they were charged in that case, but as a question of whether a witness who claimed to have worked with them on a previous smuggling job should be allowed to testify. The probativeness of that testimony depended, of course, on the reliability of that witness's ability to identify the defendants as the men with whom he had worked. The different context seems unimportant, then, given the fact that the ultimate question— reliability of the identification evidence—was the same, and that in determining that it was sufficiently reliable, the First Circuit must certainly be understood to have held that its

admission did not violate the defendants' due process rights.

**6.** It is true that some courts have read the *Brathwaite* language to preclude using other evidence of guilt in determining the admissibility of identification testimony. *United States v. Rogers,* 126 F.3d 655, 659 (5th Cir. 1997); *United States v. Emanuele,* 51 F.3d 1123, 1128 (3d Cir.1995); *Green v. Loggins,* 614 F.2d 219, 225 (9th Cir.1980). All of these cases cite Justice Stevens's *Brathwaite* concurrence. In at least two of the circuits with holdings rejecting the use of other evidence, however, the language of *Brathwaite* has engendered confusion, and there appears to be no settled rule about the use of corroborative

So far as I know, there is no case overturning what was clearly the Second Circuit's rule before *Brathwaite*, that "other evidence connecting a defendant with the crime may be considered" to determine an identification's reliability. *Reid*, 517 F.2d at 967; *United States ex rel. Springle v. Follette*, 435 F.2d 1380, 1384 (2d Cir.1970). One Second Circuit case, upholding the admission of identification testimony, includes *Brathwaite*'s equivocal language in dictum disclaiming reliance on the use of other evidence of guilt. *United States v. Sanchez*, 603 F.2d 381, 386 n. 6 (2d Cir. 1979). Nonetheless, a subsequent Second Circuit holding relies on corroborative evidence and provides more substantial guidance on this issue. *Sims v. Sullivan*, 867 F.2d 142 (2d Cir.1989). That case involved the plainly suggestive identification procedure presented in almost every eyewitness identification case—the in-court identification. Upholding a conviction that involved such an identification against a habeas challenge, Judge Winter explained that "where the pretrial identification procedures were proper *and the other evidence of the defendant's guilt was ample*, no deprivation of due process exists." *Id.* at 145 (emphasis added). *Sims* strongly supports a general rule including corroborative evidence in the reliability analysis of suggestive identifications.

The petitioner in *Sims* was identified at his trial by a witness who had previously picked the petitioner out of a photo array with some uncertainty. Sims's request for a lineup prior to the in-court identification was denied. Holding that the in-court identification was not so unreliable as to "constitute a denial of fundamental fairness," Judge Winter found that it had not been tainted by any suggestive pretrial procedures. *Id.* As a result, under Second Circuit precedents, he was not obligated to address the independent reliability of the in-court identification. *Id.* But, significantly for the analysis here, the panel nevertheless considered whether the failure to grant a lineup resulted in an in-court identification that was "so unreliable that 'a very substantial likelihood of irreparable misidentification exists.'" *Id.* (quoting *Brathwaite*, 432 U.S. at 116, 97 S.Ct. at 2254 (internal quotation omitted)). In other words, the Second Circuit treated the in-court identification as a separate, suggestively obtained, identification.

In analyzing the reliability of this apparently fairly typical—and, thus, highly suggestive—in-court identification of the accused at the defense table, *Sims* held that a federal court is "not bound in a collateral attack upon a state court conviction to view an in-court identification in isolation from the rest of the evidence." *Id.* at 146. Judge Winter went on to explain that "the validity of an in-court identification, and, conversely the need for a lineup, will ... vary according to the strength and nature of the other evidence against a defendant." *Id.* An accomplice had directly implicated Sims in the charged acts, and another witness had testified that the petitioner had admitted the crime. *Id.* Thus the in-court identification was "less crucial" then it would have been in isolation. *Id.*

It is quite apparent that the analysis in *Sims* was not a harmless error inquiry. As noted, the opinion states expressly that "other evidence of the defendant's guilt" is relevant to the initial question whether a "deprivation of due process exists" as the result of a suggestive identification. *Id.* at 145.[7] Because the pretrial identification in

---

evidence in determining whether a suggestive identification was properly admitted. *Compare Emanuele*, 51 F.3d at 1128, *with Reese v. Fulcomer*, 946 F.2d 247, 259 (3d Cir.1991), *and Government of the Virgin Islands v. Riley*, 973 F.2d 224, 228 (3d Cir.1992); *and compare Rogers*, 126 F.3d at 659, *with Cronnon v. State of Alabama*, 587 F.2d 246, 250 (5th Cir.1979).

7. Note also that after asserting that in a habeas proceeding the court need not view the identification in isolation from the other evidence Judge Winter inserted a *"cf."* citation to *United States v. Archibald*, 734 F.2d 938, 941 (2d Cir.1984) (modified on other grounds, 756 F.2d 223 (2d Cir.1984)), which applied harmless error analysis.

*Sims* was treated as a separate suggestive identification, there is no logical reason to diverge from the reliability analysis in *Sims* when determining the admissibility of any suggestively obtained identification testimony, particularly in the habeas context.

Moreover, in the present case, there is an additional factor that weighs in favor of considering petitioner's admission in evaluating the reliability of the identification evidence. When Judge Leventhal wrote that "the interest guarded by *Stovall* cannot so easily be factored out and assessed independently of the evidence," *Clemons*, 408 F.2d at 1251, he did so in the context of a retroactive application of the rule against admitting unreliable identification testimony. Thus the identification procedures that were challenged had been conducted before the police were alerted to the due process ramifications of any suggestive aspects of those procedures. The present case is analogous.

We have here a confrontation that was never intended to produce an identification of the person the witnesses confronted. The state hearing judge found that, at the time of the lineup, petitioner was not viewed by the police as a suspect. He was put into the line as a filler, without any notion that he might be recognized as the shooter. Thus the confrontation that led to petitioner's identification was not a deliberate effort by the police to obtain an identification of petitioner. Under the circumstances, the police understandably might have assumed there was no need to take precautions to prevent its suggestiveness. Indeed, any attempts to minimize suggestiveness were properly directed at preventing the identification of the suspect around whom the lineup was organized.

There is no question that wearing the coat was suggestive of petitioner's guilt. Still, the fact that petitioner's presence in the lineup was coincidental might amount to a good reason why the detective who arranged the lineup did not take care to minimize the suggestiveness that only became important after the fact. It is hard to say that when he failed to make petitioner take off his coat he created an identification procedure that was any more *unnecessarily* suggestive than the pre-*Stovall* cases to which Judge Leventhal referred.[8] It was certainly less so than the identification in *Sims*, which was ultimately sustained because of the corroborative evidence of guilt.

■ In order to trigger due process concerns, an identification procedure must be both suggestive *and* unnecessary. Even the most suggestive confrontation will produce admissible evidence, providing "there was some good reason for the failure to resort to less suggestive procedures." 1 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 7.4(b) at 581 (1984). In *Stovall*, the suspect was handcuffed to police officers when he was pre-

---

8. *See Reese*, 946 F.2d at 261 (witness's inadvertent viewing of defendant while standing outside courtroom was not "impermissibly suggestive"); *Stevens*, 935 F.2d at 1390 (doubtful that victims' "fortuitous discovery" of attacker on wanted board "resulted from an unnecessarily suggestive identification procedure. Wanted boards, by nature, are composed of disparate photographs and sketches.... Recognizing this inherent limitation ... although wanted boards are often suggestive, they are not 'unnecessarily' so"); *United States v. Domina*, 784 F.2d 1361, 1370 (9th Cir.1986) (witness's viewing of defendant outside courtroom "was accidental and was not so suggestive as to require exclusion" of identification testimony or in-court identification); *Albert v. Montgomery*, 732 F.2d 865, 872 (11th Cir.1984) (where state habeas court found that confrontation was "complete happenstance, unarranged by the police," the "brief, inadvertent encounter ... was not impermissively suggestive"); *United States v. Clark*, 506 F.2d 416, 418 (5th Cir.1975) (brief observation of defendant in handcuffs during court recess did not impermissibly taint identification testimony); *United States v. Famulari*, 447 F.2d 1377, 1380–81 (2d Cir.1971) (witness's view of defendant at counsel table before entering court did not taint subsequent in-court identification, where viewing was no more suggestive than initial in-court identification would have been).

sented to the witness in her hospital room. As the Supreme Court commented in *Wade*, "It is hard to imagine a situation more clearly conveying the suggestion to the witness that the one presented is believed guilty by the police." *Wade*, 388 U.S. at 234, 87 S.Ct. at 1936. Nevertheless, the identification that resulted from that blatantly suggestive procedure was held admissible at trial because the Court judged that, under the circumstances, "an immediate hospital confrontation was imperative." 388 U.S. at 302, 87 S.Ct. at 1972. The Court adopted the justification given for the suggestive confrontation by the Court of Appeals—that the bedridden, and possibly dying, witness was the "only person in the world who could possibly exonerate Stovall," *id.*, although, as Judge Friendly later observed, it is hard to see "why if five police officers and prosecutors could have been assembled in her hospital room without danger to her health, one or two blacks could not have been found and allowed to accompany Stovall." *Brathwaite*, 527 F.2d at 370, n. 12.

The situation in this case is quite different from that in *Stovall* and from the suggestive identifications taking place in courtrooms in almost every eyewitness identification case. The situation is also different from that in *Foster v. California*, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969), upon which petitioner relies. *Foster* involved deliberate and repeated suggestive confrontations, in one of which the defendant wore suggestive clothing. *Id.* at 441–42, 89 S.Ct. at 1128. Here, petitioner was intentionally included in the lineup as a filler. Yet there was no plan by the police to confront petitioner with witnesses in order to obtain an identification of him, let alone any attempt to obtain that identification by suggestion. Because petitioner happened to be in the precinct he was included in the lineup, and because he happened to be wearing his black leather coat he was identified as the shooter. Neither of the crucial circumstances that led to the identification—petitioner's participation in the lineup or what he was wearing—was deliberately orchestrated by the police to obtain an identification of petitioner.

The Supreme Court has never explicitly decided how such a lack of deliberate police action factors into the determination whether an identification procedure was unnecessarily suggestive. In one case, however, which also happened to involve suggestive apparel worn in a lineup, the Court seemed to indicate that the degree of police involvement in creating the suggestive circumstance was part of the inquiry. In *Coleman v. Alabama*, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970), the Court addressed a claim by a habeas petitioner that he had been unfairly singled out to wear a hat in a lineup, when all the other participants were bareheaded and one of the perpetrators had worn a hat. The Court gave two reasons for finding this due process claim meritless. It appeared from the record that the hat was not the basis of the identification; but the Court also took care to note that although the petitioner apparently was the only one in the lineup wearing a hat, "nothing in the record shows that he was required to do so" by the police. *Id.*, 399 U.S. at 6, 90 S.Ct. at 2002. *Cf. Wade*, 388 U.S. at 233, 87 S.Ct. at 1935 (listing among examples of suggestive procedures "that only the suspect was required to wear distinctive clothing which the culprit allegedly wore").[9] As

9. Other cases on which petitioner relies stress that the defendants were required to wear a particular item by police intent on deliberately creating the suggestive confrontation. *See United States ex rel. Pierce v. Cannon*, 508 F.2d 197, 201 (7th Cir.1974) (criticizing practice of "[r]equiring suspects to wear distinctive clothing during their participation in a lineup"); *United States ex rel. Cannon v. Montanye*, 486 F.2d 263, 266–67 (2d Cir.1973) (where defendant was told by a police officer to wear a green sweater with full knowledge that the victims had described their assailant as wearing a green shirt, identification method might well have been unduly suggestive, particularly "in view of police complicity in arranging an unfair lineup"). *See also Willis v. Garrison*, 624 F.2d 491, 495 (4th Cir.1980)

in *Coleman*, there is nothing in the record here to indicate that petitioner was required by the detective to wear the black leather coat that turned out to be so suggestive to the witnesses.

■ It is true that since *Coleman*, the decisions in *Biggers* and *Brathwaite* have emphasized that the ultimate reliability of identification evidence is "the driving force," 432 U.S. at 111–12, 97 S.Ct. at 2251–52, of the Court's approach to identification cases, but the Court has continued to count deterrence of improper police procedures as one of the interests served by the exclusion of evidence based on unnecessarily suggestive identification procedures. *See Gonzalez v. Hammock*, 639 F.2d 844, 848 (2d Cir.1980) ("There are two main reasons identification procedures have been suspect: first, the general problem of relying on eyewitness identification and second, the use of such procedures by overzealous police departments."). At the very least, as the Third Circuit observed in *Stevens*, the interest in deterrence would seem to apply with less force when an identification is not the product of a deliberate police action. 935 F.2d at 1390 n. 11. Moreover, the Supreme Court has continued to emphasize that " 'a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it.' " *Brathwaite*, 432 U.S. at 104, 97 S.Ct. at 2248 (quoting *Stovall*, 388 U.S. at 302, 87 S.Ct. at 1972). Certainly the fact that not only the suggestiveness of the confrontation with petitioner but the confrontation itself resulted from happenstance rather than design is a circumstance relevant to whether the resulting identification was *unnecessarily* suggestive. Under these circumstances, the presence of corroborating evidence should tip the scales in favor of allowing the jury to consider the eyewitness identification.

(requiring suspects to put on clothing they discarded on the way to a confrontation shortly after the crime "is a far cry" from

*Gonzalez v. Hammock*, 639 F.2d 844 (2d Cir.1980), suggests as much. There the panel reversed a grant of habeas corpus where there "was no suggestion that the police had planned the so-called 'show up.' " *Id.* at 846. A robbery victim who was being interviewed at the police station looked into an adjoining room and saw Gonzalez sitting with another robber whom the witness recognized. The witness spontaneously identified Gonzalez as the third of three men who had committed the robbery and fled in a car that was later stopped by the police. On the strength of that stationhouse identification and the description given by another victim, Gonzalez, rather than a fourth passenger in the car, was charged with the robbery. At trial, however, the witness was unable to identify Gonzalez.

Gonzalez challenged the admission of the stationhouse identification. In response, the Second Circuit cited *Brathwaite* for the central due process focus on reliability and analyzed the five *Biggers–Brathwaite* factors, finding that they "clearly offset[ ] the possible corrupting effect of any inadvertent suggestiveness at the police station." *Id.* at 848. The analysis, however, did not end there. After noting that "banning use of this identification will not deter any kind of untoward police practice," consideration was given to the additional evidence of Gonzalez's guilt:

> Finally, as the Supreme Court has done, we must acknowledge other aspects of this case which, although peripheral, certainly do not detract from our decision. See Manson, 432 U.S. at 116, 97 S.Ct. 2243, 53 L.Ed.2d 140. These include the facts that a jury saw [the eyewitness] and heard his testimony and accepted his statements concerning the circumstances surrounding the identification, and the identification itself. More importantly, Gonzalez admitted being in the automobile which contained

dressing suspects in incriminating clothing to influence identification).

the robbers of the gas station. This was not the chance of picking Gonzalez out of millions of others, but rather the third robber was either Gonzalez or Rodriguez. Finally, [the other robbery victim] described the third robber as having dungarees, a white T-shirt and an Afro. Gonzalez was so dressed that night. [The other passenger in the getaway car] had on a dashiki and had short hair. Thus, *there was independent evidence bolstering the identification of Gonzalez.*

*Id.* (emphasis added). Thus, although characterizing it as "peripheral" out of deference to the elliptical language in *Brathwaite,* it is plain that the corroborating evidence was consequential, if not decisive.

In any event, there is no clear Supreme Court holding establishing that an accidentally suggestive identification may still violate due process. *Coleman v. Alabama* may suggest the contrary, even when corroboration is not present. A recent Second Circuit case, however, might be read to support a rule that looks to suggestiveness, rather than its cause, to determine the admissibility of eyewitness identification evidence. *Dunnigan v. Keane,* 137 F.3d 117 (2d Cir.), cert. denied, 525 U.S. 840, 119 S.Ct. 101, 142 L.Ed.2d 81 (1998), holds that an unnecessarily suggestive identification procedure arranged by a private citizen gets due process scrutiny. Arguably, *Dunnigan's* focus "on the fairness of the trial," *id.* at 128, rather than the identification procedure, would diminish the importance of the accidental nature of the suggestiveness in petitioner's case. For three reasons, however, the case is not controlling here. First, it involved a petition that was filed on August 10, 1994, *Dunnigan v. Keane,* 972 F.Supp. 709, 711 (N.D.N.Y.1997), before the effective date of the act creating the requirement of a clear holding of the Supreme Court to justify relief. 28 U.S.C. § 2254(d)(1). More substantively, *Dunnigan* did not involve an accidentally suggestive identification procedure, and so did not consider the

possibility that the identification produced was not "unnecessarily" suggestive. *Stovall,* 388 U.S. at 302, 87 S.Ct. at 1972. Finally, and most important, *Dunnigan* did not address the issue whether the identification there could be saved by compelling corroborative evidence of guilt.

There are three sources of corroboration in this case that together are sufficient to justify allowing the jury to decide the credence to be given to the eyewitness testimony. By far the most important is petitioner's confession, in which he admitted shooting Hill (although he offered an exonerating motive—Hill was starting to reach for a gun, T–701–02). Another piece of corroborating evidence is the same thing that created the suggestiveness in the lineup: petitioner's three-quarter-length black leather coat, which he was wearing twenty days after the robbery. This was apparently no run of the mill garment. Arthur Shiloh explained that it was outstanding "because it wasn't no cheap coat." W–147. Vincent Cooke also emphasized that the coat was memorable. W–165. While the fact that petitioner was the only one in the lineup wearing such a coat made his identification suggestive, the fact that he had the coat a relatively short time after the robbery provides further corroboration of his guilt.

Moreover, in addition to the foregoing evidence, the record demonstrates that petitioner has a propensity not only to kill, but a preference for doing so with a bullet to the head. Sentencing Hearing of April 6, 1981 at 12. The murder of which he was convicted here was the first of four he committed within a twenty-day period. *Id.* While propensity evidence may not be admissible at trial because of "the danger that the jury may condemn the accused because of other criminal behavior, and not because of the evidence of guilt of the crime charged," *Prince, Richardson on Evidence* at § 4–501 at 175, this does not preclude giving such evidence some corroborative weight for present purposes.

Nor is the corroborating evidence necessarily the end of the discussion. The force of the corroborative evidence of guilt is hardly undermined by the absence of an alibi or any kind of a defense case. This is not a question of drawing an adverse inference from petitioner's failure to testify at trial or at the suppression hearing. Instead, it simply reflects the absence of the kind of evidence that would cause one to question whether the eyewitnesses identified the right man. *See United States v. Male Juvenile,* 121 F.3d 34, 42 (2d Cir.1997) ("Rather than drawing an adverse inference, the district court was simply indicating that, by not testifying [at a suppression hearing], defendant had failed to contradict the government's evidence with his own testimony."). Indeed, the Leventhal concurring opinion quoted with approval in *Brathwaite* notes that a defendant can discredit an eyewitness identification through "countervailing testimony such as alibi." *Clemons,* 408 F.2d at 1251 (quoted in *Brathwaite,* 432 U.S. at 113 n. 14, 97 S.Ct. at 2252–53 n. 14). Not only was such an alibi not offered, but neither petitioner nor his lawyer asserted his innocence, even at sentencing. While both challenged the quality of the eyewitness identifications, neither ever said, "They got the wrong man!" Indeed, the record here confirms that "Judge Friendly's observation a quarter of a century ago that 'the one thing almost never suggested on collateral attack is that the prisoner was innocent of the crime' remains largely true today." *Schlup v. Delo,* 513 U.S. 298, 321–22, 115 S.Ct. 851, 864, 130 L.Ed.2d 808 (1995) (quoting Henry J. Friendly, "Is Innocence Irrelevant? Collateral Attack on Criminal Judgments," 38 U. Chi. L.Rev. 142, 145 (1970)).

In sum, if the "totality of the circumstances," *Brathwaite,* 432 U.S. at 121, 97 S.Ct. at 2256, includes "the totality of proof and other factors bearing on the likelihood of misidentification," *Clemons,* 408 F.2d at 1250 (Leventhal, concurring), the corroborating evidence here provides a

good reason to find that the eyewitnesses identified the right man. Particularly in this unusual case, in which the suggestive identification procedure was inadvertent—and possibly not even unnecessarily suggestive—it would be bizarre to ignore such compelling evidence of guilt and grant the writ even though there is no reason for "concern about the injustice that results from the conviction of an innocent person [which] has long been at the core of our criminal justice system," *Schlup,* 513 U.S. at 324–25, 115 S.Ct. at 866, and which underlies the due process exclusionary rule at issue here.

■ This conclusion is unaffected by the fact that the jury did not hear the corroborating evidence provided by petitioner's confession and his predisposition to kill with a bullet to the head. The corroboration rule I apply here is not a harmless error analysis. Instead, it is a review of a preliminary ruling on the admissibility of evidence. In general, the jury need not have all of the evidence that the trial judge had in making the preliminary ruling on admissibility. Fed.R.Evid. 104(a), *Bourjaily v. United States,* 483 U.S. 171, 178, 107 S.Ct. 2775, 2780, 97 L.Ed.2d 144 (1987); *see also United States v. Flores Perez,* 849 F.2d 1, 4 n. 3 (1st Cir.1988); *Miller v. Keating,* 754 F.2d 507, 511 (3d Cir.1985). The propriety of that rule in the context of an admissibility determination regarding identification testimony seems obvious when one considers its application to the *Biggers–Brathwaite* factors. In the ordinary course of things, a jury may be likely to hear much of the background evidence that makes up the five-factor test judges routinely apply. But if some piece of proof regarding, say, a witness's opportunity to view the perpetrator or witness certainty, failed to come out at trial, no one would view its absence as a basis for appeal.

In this case, consideration of corroborative evidence that was not before the jury is also consistent with *Schlup v. Delo,*

which held that, in considering whether a claim of actual innocence undermines the effect of a procedural forfeiture rule, "the district court is not bound by the rules of admissibility that would govern at trial. Instead, the emphasis on 'actual innocence' allows the reviewing tribunal also to consider the probative force of relevant evidence that was excluded or unavailable at trial." 513 U.S. at 327–28, 115 S.Ct. at 867. While the context of the inquiry into guilt or innocence here is different than it was in *Schlup,* the basic inquiry is the same. Thus, the fact that the jury never heard petitioner's confession is irrelevant.

■ Nor does the fact that the corroborating confession was excluded under New York law from the trial that produced the conviction make its consideration improper in this collateral proceeding. The confession was not obtained in violation of any United States constitutional standard, nor would it have been subject to exclusion under the Supreme Court's interpretation of the old common law "corpus delicti" rule that requires proof of the death of a homicide victim in a case where the accused confesses to the murder. *Wong Sun v. United States,* 371 U.S. 471, 491 n. 15, 83 S.Ct. 407, 419 n. 15, 9 L.Ed.2d 441 (1963).[10] While this rule has been expanded to require corroborative evidence implicating the accused where there is no corpus delicti, that is, no tangible injury, *Smith,* 348 U.S. at 154, 75 S.Ct. at 198, the more limited rule continues to apply to murder cases. The Supreme Court has made clear that, while "an admission of homicide must be corroborated by tangible evidence of the death of the supposed victim," in such a case there need be "no link, outside the confession, between the injury and the accused who admits having inflicted it."

*Wong Sun,* 371 U.S. at 491 n. 15, 83 S.Ct. at 419 n. 15. The New York confession rule is the same. N.Y. Criminal Procedure Law § 60.50; *Prince, Richardson,* § 3–207(a) at 111–12. Thus, in this case, under either the federal or state rule, the requisite corroboration for the confession—the dead body—was present, and the confession itself can be used to corroborate that petitioner was the killer. *See also United States v. Braverman,* 376 F.2d 249, 253 (2d Cir.1967).

\* \* \*

This opinion was substantially completed before the Supreme Court's decision last week in *Williams v. Taylor,* —— U.S. ——, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), which construed 28 U.S.C. § 2254(d)(1). That statutory section sets out the precondition that must be met before a writ of habeas corpus may be granted: The decision of the state court must be "contrary to, or involve[ ] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). *Williams v. Taylor* held that

[u]nder the "contrary to" clause, a federal habeas court may [only] grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may [only] grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

---

**10.** That rule is not mandated by the Constitution and has been much criticized. Judge Learned Hand expressed doubt that there is "any substantial necessity in justice" for the rule requiring corroboration of confessions, and noted that "it seems never to have become rooted in England." *Daeche v. United States,* 250 F. 566, 571 (2d Cir.1918). More

recently, Judge Silberman has suggested that, "post-Miranda, the need for the rule, especially insofar as it protects against involuntary confessions, is even more questionable." *United States v. Dickerson,* 163 F.3d 639, 641 n. 2 (D.C.Cir.1999). See also, Thomas A. Mullen, "Rule Without Reason," 27 U.S.F. L.Rev. 385 (1993).

—— U.S. ——, 120 S.Ct. 1495, 1523. Moreover, the Supreme Court emphasized that more than an erroneous ruling is required to make a state judge's decision "unreasonable."

■ Here, the state trial judge decided to admit the identification evidence on the ground that the lineup "wasn't for the purpose of identifying the defendant to begin with. It was for the purpose of attempting to identify someone else as the perpetrator." W–260. The Appellate Division affirmed this ground for the denial of the motion to suppress, although it also found that the eyewitness identifications had an "independent source." *Whitaker,* 428 N.Y.S.2d at 700. The ground relied on by the trial judge for admitting the eyewitness identifications is not "contrary to," nor does it involve an "unreasonable application" of "clearly established Federal law, as determined by the Supreme Court," § 2254(d)(1), even without considering the compelling corroborative evidence identifying petitioner as the murderer of Charles Hill. Thus, one aspect of the issue presented in this case—i.e., the accidental nature of the suggestiveness—may itself mandate a denial of the writ under § 2254(d)(1) as construed in *Williams.* Because the New York courts did not consider the corroborating evidence in admitting the identification testimony, it may be inappropriate to rely on the deferential standard of review under § 2254(d)(1) in that aspect of my analysis. Such a deferential standard is not required, however, to support the due process admissibility analysis I apply. It is enough that there is no binding precedent that precludes it and much in the way of reason and caselaw to support it.[11]

### Conclusion

The petition for a writ of habeas corpus is denied. Because of the open texture of the relevant precedents, petitioner has made a showing sufficient to justify granting a certificate of appealability. I grant that certificate with regard to the single issue presented in the petition.

**SO ORDERED.**

### *SUPPLEMENTAL MEMORANDUM*

On April 28, 2000, I filed a memorandum and order denying the petition for a writ of habeas corpus. Prior to filing the opinion, I had asked the parties to confirm the relationship of petitioner's sentences for his two jury–trial convictions and the sentences he received for the murder indictments to which he pled guilty. Because that information was not readily available, I filed the memorandum and order without awaiting it. The parties have now provided further documentation in the form of the minutes of a sentencing hearing, held on March 9, 1977, for the murders to which petitioner pled. That proceeding followed petitioner's *first* trial conviction for the murder of Charles Hill. There, the judge indicated that, although he had initially imposed a sentence for the Hill murder that would run consecutive to the sentence of 25 years to life imposed on his previous jury trial conviction for the murder of Harriet Gathers, the Hill sentence should now be understood to run *concurrent* to all the other sentences. I wish to call the parties' attention, however, to the minutes of the sentencing held on April 6, 1981, after petitioner's *second* trial for the Hill murder. Exhibits Accompanying Petition for a Writ of Habeas Corpus, Vol. II, Ex. E, EDNY file doc #55. At this second sentencing proceeding, petitioner was sentenced to a term of 25 years to life for the murder of Hill, "to be consecutive to the sentence imposed by Judge Barshay in Indictment Number 288 of 1976," *Id.* at 13 (attached), i.e., the Gathers sentence.

---

**11.** If the record contains a basis for rejecting a challenge to the validity of a judgment of conviction, a habeas court may rely on it even if it was not relied on by the state courts. *Pinkney v. Keane,* 920 F.2d 1090 (2d Cir.1990) (affirming district court denial of habeas corpus relief, 737 F.Supp. 187 (E.D.N.Y.1990), where district court denied the writ on grounds rejected by state courts).

The sentencing minutes provided by the parties, however, indicate that the first sentencing judge, Justice Tsoucalas, believed that under New York law, "there is no such thing as a consecutive 25 years to life [sentence], since a man only has one life, and the 25 years minimum merged with each other, and the minimum is 25 years." Minutes of plea/sentencing March 9, 1977, p. 23. While the second sentencing judge clearly intended to impose a term of 25 years to life *consecutive* to petitioner's previous sentence for the Gathers murder, if Judge Tsoucalas's legal interpretation is correct, all petitioner's sentences run *concurrent* to one another. My purpose in filing this additional memorandum is to point out that, should that be the case, the concurrent sentence doctrine would provide an alternative ground for denying the petition. Indeed, until I came across the minutes of the second sentencing proceeding, I intended to make this discretionary doctrine an additional basis for my decision.

While the concurrent sentence doctrine is normally applied to avoid reaching the merits of one or more counts of a multi-count indictment, the logic of the rule should extend to convictions on charges that were brought separately. See *United States v. Papadakis*, 510 F.2d 287, 299 (2d Cir.1975)(considering, though deciding not to apply, concurrent sentence doctrine where defendant's claim of error concerned conviction whose 5–year sentence was "merely repetitive of the consecutive five year sentences of imprisonment he had previously been sentenced to by other judges under convictions which have long since become final"). Although it is usually applied on direct appeal, the reasons for the rule would extend to a collateral proceeding. See *Pinkney v. Keane*, 920 F.2d 1090, 1098–99 (2d Cir.1990)(noting that habeas corpus application is "simply another stage in the same case," and citing 1 J. Liebman, Federal Habeas Corpus Practice and Procedure § 26.2, at 387–88 (1988) in support of "the increased acceptance of the appellate analogy to federal habeas cor-

pus"). Indeed, it has been suggested that there is "less objection to use of the doctrine in connection with a collateral attack on a conviction ... as distinguished from a direct appeal." *United States ex rel. Weems v. Follette*, 414 F.2d 417, 419 (2d Cir.1969), citing *Benton v. Maryland*, 395 U.S. 784, 793 n. 11, 89 S.Ct. 2056, 2062 n. 11 (1969).

Although the concurrent sentence doctrine remains viable, see *Barnes v. United States*, 412 U.S. 837, 848 n. 16, 93 S.Ct. 2357, 2364 n. 16 (1973), there is uncertain sympathy for the rule, principally because of concerns about the collateral consequences of a criminal conviction. See *United States v. Vargas*, 615 F.2d 952, 959 (2d Cir.1980). Here, however, petitioner stands convicted of three other murders, all accomplished within 20 days of the killing of Hill. If his sentence for the Hill murder were to run concurrent to the other sentences he received, his conviction in this case would add nothing significant to the consequences that flow from his other convictions.

June 5, 2000.