August KENNAUGH, Petitioner,

v.

David MILLER, Superintendent, Eastern Correctional Facility, Respondent.

No. 99–CV–4695 ERK.

United States District Court, E.D. New York.

April 20, 2001.

tion to include the claim that an eyewitness, who failed to identify him at a lineup held seven months before trial, was permitted to do so in a suggestive in-court setting.

Anthony V. Lombardino, Richmond Hill, NY, for petitioner.

Richard A. Brown, Dist. Atty., Queens County, Kew Gardens, NY (John M. Castellano, Nicole Beder, Donna Aldea, Asst. Dist. Attys., of counsel), for respondent.

## MEMORANDUM & ORDER

KORMAN, Chief Judge.

August Kennaugh seeks habeas corpus relief from his conviction for one count of second-degree murder and two counts of first-degree robbery. After a jury trial, petitioner was sentenced to concurrent indeterminate terms of imprisonment of twenty-five years to life for the murder conviction, and eight and one-third to twenty-five years on each of the robbery convictions. The Appellate Division affirmed the conviction, *People v. Kennaugh*, 92 A.D.2d 1090, 459 N.Y.S.2d 953 (2d Dep't 1983), and petitioner's application for leave to appeal to the New York Court of Appeals was denied. 59 N.Y.2d 677, 463 N.Y.S.2d 1036, 450 N.E.2d 259 (1983).

The underlying crimes were committed in the early morning of October 5, 1979, when petitioner and two other men forced themselves into a restaurant in order to commit a robbery. During the robbery, the owner of the restaurant was stabbed to death. Petitioner was arrested four months later. Petitioner seeks relief on two grounds. In his original petition, he claimed that the District Attorney failed to disclose that two witnesses had observed the perpetrators just prior to the crime and were unable to identify petitioner at a lineup. Petitioner later amended the peti-

## BACKGROUND

In the early morning of October 5, 1979, Guelfo Nello Terzi, the owner of Caesar's Restaurant ("Caesar's"), Gemma Terzi, his wife, and Elio Rusnjak, the bartender, were closing the restaurant for the night. As Rusnjak opened the door to leave, three young men (one allegedly being petitioner), two of whom were carrying guns, forced their way into the restaurant. Tr. 41–42; 108–09. Mrs. Terzi and Rusnjak were thrown on the floor, and two of the men watched and guarded them. Tr. 56; 109. Mrs. Terzi's pocketbook, jewelry, and gold, among other items, were taken from her. Tr. 56–58. The third man took Mr. Terzi to the cash register at the bar and then to the kitchen where approximately $500 was kept to start the next day. Tr. 58, 65; 109.

Mrs. Terzi and Rusnjak were also taken to the kitchen. Tr. 59; 111. Both of them were thrown to the floor and Mrs. Terzi was tied up with a napkin. Tr. 59–60; 111. Two of the men went with Mr. Terzi to the other side of the kitchen, where the refrigerator containing a box with money was located. Tr. 111. One of them forced Rusnjak to get up, told him not to remember anything when the police came, and made him take off his belt and pants. Tr. 112. Rusnjak was then forced to lay down again, hit twice with a gun, and tied up with his belt. Tr. 61; 112. One of the perpetrators suggested raping Mrs. Terzi, but she was not in fact raped. Tr. 60–61; 113. Mrs. Terzi recalled that one of the perpetrators said to her husband, "If you don't give us the money, we will kill you," and Mrs. Terzi responded, "Then kill me."

424

Tr. 62. Mr. Terzi was then stabbed and killed, and another of the perpetrators screamed, "Why you do that, Why you do that." Tr. 63. As the men ran out, one of them, identified as petitioner, pointed a gun at Mrs. Terzi and told her that she should not remember his face or tell the police she has seen anything. Tr. 63. After the perpetrators left the restaurant, Mrs. Terzi untied herself and Rusnjak. The two of them discovered that Mr. Terzi had been stabbed with a kitchen knife. Tr. 64; 113–13. Rusnjak then called the police. Tr. 64; 114.

Petitioner was arrested on February 3, 1980, and he was tried in New York State Supreme Court, Queens County, in early 1981. The case against him consisted primarily of petitioner's fingerprint on the cash register at the scene of the crime and of eyewitness identifications.

### 1. *Fingerprint Evidence*

Detective Gerald Donohue testified for the prosecution that on the night of the incident, he lifted a fingerprint that was located on the bottom of the drawer of the cash register. Tr. 144–49. He opined that, because of the area in which the drawer was located and the amount of times a cash register is used, the print could have been on the register for at most two days. Tr. 152–53. At this point in the trial, Rusnjak had testified that the cash register remained open at night after it was emptied. Tr. 107. He did not testify as to the number of times the cash register was used when the restaurant was open. Nevertheless, the former owner of Caesar's, Wilfredo Betancourt, later testified that large bills and checks were kept underneath the cash register tray. Tr. 282–84. After Betancourt testified, the prosecution moved to recall its fingerprint experts, to specifically address the significance of this use of the cash register tray,

Tr. 289, but the trial judge denied the motion, believing that the evidence would be cumulative. Tr. 293. Indeed, while Detective Donohue conceded in his testimony that the drawer was not subject to air when the register is closed, he noted that the drawer was subject to friction caused by placing large bills under the drawer. Tr. 155–56. Donohue also stated that, "[i]f the drawer wasn't used [a fingerprint] could last an indefinite period of time as long as it wasn't disturbed." Tr. 158.

Officer John Dee testified as an expert in latent fingerprints that the fingerprint found on the cash tray belonged to petitioner. Dee testified that he compared a fingerprint taken of petitioner when he was arrested with a partial latent fingerprint found on the cash register in the restaurant. Tr. 178–79. He concluded that the left thumb was a match, Tr. 186, and that "[i]t's impossible for that latent print to be any other print than that print there of [the left thumb] finger." Tr. 189. In response to a question from defense counsel concerning how long a print could remain on a cash register that is primarily closed, Dee stated that it would depend on atmospheric conditions, use of the equipment, and various other factors, and that it could be any length of time. Tr. 195–96.

Petitioner did not dispute that his fingerprint was on the cash register. Instead, he attempted to explain the presence of his fingerprint by showing that he had touched the cash register at a time other than during the robbery. John Harms, an electrician who knew petitioner's parents and frequented Caesar's, and Thomas McManus, the owner of a bar frequented by petitioner's father, testified that they had seen petitioner and his father in Caesar's on numerous occasions. Tr. 258–59; 264–66. Both witnesses admitted on cross-examination that they had

never seen petitioner touch the cash register. Tr. 261; 267. This missing piece was filled by the testimony of Mr. Betancourt, the former owner of Caesar's, who had sold the restaurant and moved to Florida about a year and one-half before the trial. Tr. 269–70. Betancourt identified petitioner as having been in the restaurant with his father many times. Tr. 270. Some three months before the robbery, when closing the restaurant, Mr. Betancourt removed the cash tray from the register in order to count the money and the tray fell on the floor. Petitioner, who was in the restaurant, picked up the tray and gave it to Betancourt. Tr. 271. Mrs. Terzi had testified that she and her husband had not replaced any of the equipment in the restaurant. Tr. 77.

Mr. Betancourt, however, was unable to remember several details on cross-examination: the month during which he had moved to Florida, Tr. 274, the specific date or week in July when the tray fell, Tr. 284, the one time, other than the night the tray fell, when petitioner and his father stayed until the restaurant closed, Tr. 275–76, or the identities of the other people in the restaurant when the tray fell. Tr. 280. Betancourt stated that the night in July 1979 was the only time he could remember the tray falling, Tr. 276, 286, and that it was one of the rare nights that the bartender, Rusnjak, left before the restaurant had closed. Tr. 279–80.

### 2. *Identification Testimony*

The prosecution introduced two pieces of identification evidence. First, Irving Silver, a resident of Queens, testified that he was in the restaurant the night of the robbery at about 10:00 or 10:30, that he left at about 12:30, and that he saw petitioner on the street near a pizza store, four stores away from the restaurant. Tr. 129–31. Silver could not remember whether petitioner was with anyone else. Tr. 131. Silver testified that in July 1980, he observed a lineup and identified petitioner as the person he had seen outside the pizza store. Tr. 131–33. Silver also identified petitioner at the trial. Tr. 130. This testimony placed petitioner in the neighborhood a little over an hour before the robbery was committed. Silver acknowledged on cross-examination that the pizza store was a place where young people congregated, Tr. 135, and stated that he did not recognize petitioner's counsel as one of the persons present at the July 1980 lineup. Tr. 133–34. Second, Mrs. Terzi identified petitioner as one of the perpetrators of the crime. Tr. 62–63. The circumstances of her identification are discussed more fully in the portion of this memorandum that addresses petitioner's challenge to the admissibility of her identification. Suffice it to say here that Mrs. Terzi's identification was of minimal probative value.

Petitioner was convicted of one count of second-degree murder and two counts of first-degree robbery, and sentenced to concurrent indeterminate terms of imprisonment of twenty-five years to life for the murder conviction, and eight and one-third to twenty-five years on each of the robbery convictions.

### THE POST–CONVICTION MOTION

At some point after the judgment of conviction became final, petitioner's counsel came across two DD–5 police reports that described interviews with Jack Basilico and Joseph Bovino. Basilico and Bovino were patrons at the restaurant on the night of the robbery, and at about 1:00 A.M., they saw three young men trying to get inside the restaurant in order to purchase cigarettes from a vending machine in the restaurant's vestibule. The men passed a dollar bill through the door to Mr. Terzi who then slipped a pack of ciga-

rettes back to the men. Affidavit and Memorandum of Law in Opposition to Petition for a Writ of Habeas Corpus, at ¶ 6 ("Mem. in Opp."); Amended Petition for Writ of Habeas Corpus, ¶ 8 ("Amend. Pet."). Basilico and Bovino left the restaurant at about 1:30 A.M. and saw the men making a phone call on a street corner outside the restaurant. Mem. in Opp., ¶ 7; Amend. Pet., ¶ 8. They did not witness the incident. The DD–5s discussed their failure to identify petitioner at a photo viewing on October 6, or at a lineup that took place on October 23, 1980, approximately one year after the robbery. The DD–5s also contained their statements that they would be able to identify in person the youths that had bought the cigarettes. Decision, Motion to Vacate Judgment, March 11, 1998, at 3 ("§ 440.10 Decision"); Mem. in Opp., ¶ 19.

On May 2, 1996, petitioner filed a motion to vacate the judgment of conviction pursuant to New York Criminal Procedure Law § 440.10, on the ground that the prosecution had willfully concealed exculpatory evidence when it failed to disclose evidence relating to Basilico and Bovino, in violation of *Brady* and *Rosario.* Amend. Pet., ¶ 17. After an evidentiary hearing, the motion to vacate the judgment was denied. § 440.10 Decision, at 1. The judge presiding at the § 440.10 hearing found that "the prosecution failed to deliver the two DD–5's at issue to the defense and did not inform them of Basilico and Bovino's inability to identify [petitioner] in the lineup." *Id.* at 5 (footnotes omitted). Nevertheless, the judge also found that defense counsel knew that a second lineup had been conducted and had a duty to inquire into the results of that lineup. *Id.* at 5 n.2. More significantly, the police reports were not material evidence because a reasonable probability did not exist that the disclosure of the reports would have altered the outcome of the trial. Specifically, the judge

concluded that "any assistance Basilico and Bovino would have provided if called as defense witnesses is highly speculative. They were not eyewitnesses to the crime. Furthermore, there is nothing which links the perpetrators of the crimes to the young men who earlier had purchased cigarettes from the victim." *Id.* at 6. Under these circumstances, if called at the trial, they would have testified only that, a year after the event, they could not identify petitioner as one of the three men who they had seen in the vicinity of the restaurant shortly before the robbery.

Some time after the denial of the § 440.10 motion, petitioner's mother found buried in her closet two DD–5s that involved interviews with Mrs. Terzi and Rusnjak, the bartender. Affirmation, in support of Motion to Reargue, Anthony V. Lombardino, ¶ 7. In the respective DD–5s, both Mrs. Terzi and Rusnjak stated that the men who had purchased cigarettes were the same men that later forced themselves into Caesar's and perpetrated the crimes. *Id.,* ¶ 8; Ex. B. The significance of the DD–5s is that they place in a somewhat more helpful light to petitioner the failure of Basilico and Bovino to identify him as one of the persons they saw purchasing cigarettes from the victim earlier in the evening before the robbery. If, as the latest DD–5s indicate, the persons who purchased the cigarettes were the same persons who later returned to the restaurant to commit the robbery and murder, their inability to pick petitioner out of the lineup was more significant than the bare fact that they could not identify petitioner as one of the men who they had seen in the vicinity of the restaurant.

On the basis of the two additional DD–5s, petitioner moved on March 3, 1999 to reargue his § 440.10 motion. The motion was denied for two reasons. The court concluded that the results of the trial

would not likely have been different had the DD–5 reports been turned over to the defense. Order, Motion to Reargue, April 7, 1999, at 2 ("Order, Motion to Rearg."). The court also found that petitioner had failed to make any showing as to why the additional police reports could not have been submitted with the initial § 440.10 motion when they had been in his mother's possession. *Id.* at 1–2. The judge cited to three cases denying motions for renewal and/or reargument that had been supported with additional facts because of the failure to offer valid excuses for not having included the evidence in the original motions. *See People v. Chetrick,* 255 A.D.2d 392, 681 N.Y.S.2d 287 (2d Dep't 1998); *Misek–Falkoff v. Village of Pleasantville,* 207 A.D.2d 332, 615 N.Y.S.2d 422 (2d Dep't 1994); *Caffee v. Arnold,* 104 A.D.2d 352, 478 N.Y.S.2d 683 (2d Dep't 1984). All three of these cases cite to *Foley v. Roche,* 68 A.D.2d 558, 418 N.Y.S.2d 588 (1st Dep't 1979), in which the Appellate Division discussed the difference between motions for reargument and renewal. A motion for reargument is "designed to afford a party an opportunity to establish that the court overlooked or misapprehended the relevant facts, or misapplied any controlling principle of law." *Id.* at 567, 418 N.Y.S.2d 588. A motion for renewal, which is at issue here despite petitioner's characterization of his motion as one for reargument, "must be based upon additional material facts which existed at the time the prior motion was made, but were not then known to the party seeking leave to renew, and, therefore, not made known to the court." *Id.* at 568, 418 N.Y.S.2d 588. A motion for renewal should be denied "where the party fails to offer ·a valid excuse for not submitting the additional facts upon the original application." *Id.* (citations omitted). In this case, the judge found that petitioner had not offered a valid excuse for failing to submit the police reports with the original motion.

The judge did not rely on Section 440.10(3)(c) of New York's Criminal Procedure Law, which would seem to have been the relevant statutory provision if petitioner had filed a second § 440.10 motion to vacate his judgment of conviction. Section 440.10(3)(c) provides that a motion to vacate a judgment may be denied when, "[u]pon a previous motion made pursuant to this section, the defendant was in a position adequately to raise the ground or issue underlying the present motion but did not do so." § 440.10(3)(c). This provision, however, provides that, "in the interest of justice and for good cause shown," the second successive motion may be granted "if it is otherwise meritorious." § 440.10(3). The Practice Commentaries explain that "the test as to whether the court will exercise discretion to relieve the defendant from forfeiture will be whether the defendant can demonstrate good cause for failure to raise the ground on a prior motion." Peter Preiser, Practice Commentaries, McKinney's Consol. Laws of N.Y., Book 11A, Crim.Proc.L. § 440.10, at 427. In this case, though the judge did not refer to § 440.10(3)(c) in denying the motion for reargument, the result would not have been any different if he had treated the motion for reargument as a second motion to vacate the conviction.

On September 22, 1998, the Appellate Division denied petitioner's application for leave to appeal from the denial of the motion to reargue. Amend. Pet., ¶ 19. Petitioner filed his original petition for a writ of habeas corpus on August 13, 1999, and an amended petition on March 1, 2000.

## DISCUSSION

### I. *Brady Violation Claim*

Petitioner contends that the failure to disclose that two witnesses had observed

the perpetrators just prior to the crime and were unable to identify petitioner at a photo session or at a lineup a year after the robbery, violated his constitutional right to due process and impaired the integrity of the fact-finding process. Amend. Pet., at 14. Petitioner's initial § 440.10 motion raising this claim was denied on the merits, and the motion to reargue was denied on the merits and on the grounds of procedural default. A review of the record indicates that the denials of both motions were correct.

■ *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) held that "the suppression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196–97. Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985); *see also Strickler v. Greene*, 527 U.S. 263, 282, 119 S.Ct. 1936, 1948–49, 144 L.Ed.2d 286 (1999) (evidence is material if the failure to disclose it results in prejudice). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995).

■ In the instant case, while petitioner contends that "[t]here can be little doubt that had Basilico and Bovino been made available to the defense ... petitioner would have been acquitted," Amend. Pet., ¶ 14, a consideration of the potential effect of the two witnesses' testimony reveals that the testimony could not "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435, 115 S.Ct. at 1566. Basilico and Bovino presumably would have testified that they witnessed three men purchasing cigarettes from Mr. Terzi, had stated that they would be able to identify the men if they saw the individuals in person, but had been unable to identify petitioner at either a photo array or a lineup that took place one year after the incident. Order, Motion to Rearg., at 2. Even if other evidence established that the same three men later robbed the restaurant, this testimony does not put the case in a vastly different light or significantly strengthen petitioner's case; the testimony concerns a failure to identify, not an affirmative statement that petitioner is not one of the perpetrators. Also, the lineup did not take place until a full year after the incident, and the testimony does not directly impeach or cast significant doubt on the other evidence in the record supporting petitioner's guilt. Significantly, the jury had heard testimony that one eyewitness, Mr. Rusnjak, the bartender, was unable to identify petitioner at the trial.

Moreover, the relative strength of the other evidence at trial supports the conclusion that the failure to disclose the police reports does not undermine confidence in the verdict. First, the testimony of Irving Silver placed petitioner a few stores away from the scene of the crime a little over an hour before the robbery took place. Second, and most integral to the discussion here, was the testimony of two expert witnesses as to the presence of petitioner's fingerprint underneath the tray of the cash register. Petitioner did not dispute that

his fingerprint was on the cash tray. Rather, petitioner attempted to explain, through the testimony of three witnesses, one of whom was the former owner of the restaurant, that he frequented Caesar's restaurant with his father and on one occasion, some three months before the robbery, he picked up the cash register after it had fallen on the floor. This implausible story was undermined by evidence that (1) the fingerprint could not have lasted on the tray for more than a couple of days because of the friction that results from the placement of large bills under the tray, and that (2) large bills and checks were kept underneath the cash register tray. Tr. 282–84. Significantly, in his initial decision denying petitioner's § 440.10 motion, the judge noted that the jury "had sufficient grounds for crediting ... the fingerprint evidence which placed [petitioner] at the scene." § 440.10 Decision, at 6. The judge also stated that "[t]he jury evidently did not believe the prior owner of the restaurant when he testified for the defense and offered an innocent alternative explanation for defendant's fingerprint being on the cash register." *Id.*

Petitioner claims that the prosecution's fingerprint evidence was "totally non-probative," because Mrs. Terzi "identified petitioner as the perpetrator, who was assigned to her, and, therefore, he had no occasion to get near the cash register," and that "it was an unidentified perpetrator, assigned to her husband, that rifled the cash register, not petitioner." Amend. Pet., ¶ 13. If the perpetrator identified as petitioner was in fact never near the cash register, the corroborative power of the fingerprint would be somewhat undercut because the prosecution's case would seemingly consist of two conflicting pieces of evidence. Contrary to petitioner's contention, however, Mrs. Terzi did not clearly identify petitioner as the perpetrator who was assigned to her. Mrs. Terzi testi-

fied that a blond boy was taking care of her, but identified petitioner as the perpetrator who pointed a gun at and threatened her as he was leaving the restaurant. Tr. 62–63.

During defense counsel's cross-examination of Mrs. Terzi, after Mrs. Terzi testified about her description of the blond boy, the following exchange occurred:

Q: And the other two men, did you give, I'm sorry, you didn't see the third man. The other man, did you give Detective Restivo a description of him?

A: No.

Q: You couldn't, right?

A: No. I no saw him, that second one.

Q: But the man with the, the nice blonde, he was the one wearing the T-shirt?

A: He was always with me. He was taking care of me.

Q: Right.

A: Sure. Because he take everything from me.

Q: *So then you never told Detective Restivo about the man's eyes or his forehead, did you?*

A: *About the blonde?*

Q: *No, not the blonde, the other man. That man, the man you say is that man [the defendant]?*

A: *Yes, I say.*

Q: You told that to Detective Restivo?

A: I remember only foggy, I say the front, and the eyes because that's all I see when I was on the floor.

Tr. 87–88 (emphasis supplied). This colloquy clearly shows that Mrs. Terzi did not identify petitioner as the man who was taking care of her. Moreover, on direct appeal, petitioner acknowledged that the blond perpetrator was "never equated by Mrs. Terzi as the defendant" and that she

identified petitioner as the man who pointed a gun at her. Brief on Behalf of Defendant–Appellant, at 5, 7. Lastly, in his summation, the Assistant District Attorney indicated that Mrs. Terzi identified petitioner as the perpetrator who pointed the gun at her, not the blond. Tr. 353, 355.[1]

While the testimony suggests some confusion on this issue, Tr. 78–79, the fact that petitioner's appellate counsel, and more importantly, both trial attorneys, seem to agree that petitioner is not the blond boy who took care of Mrs. Terzi is strong evidence of how her testimony was received and understood. Moreover, even if petitioner was identified as the perpetrator that took care of Mrs. Terzi, it does not inevitably follow that he would not have had any occasion to touch the cash register. Mrs. Terzi testified that she was on the floor throughout the robbery and was moved to the kitchen at one point, so petitioner could have touched the cash register when Mrs. Terzi was not looking or when he was not visible to her.

In addition to the fingerprint evidence, Detective James Restivo and Sargent Frederick Dielensnyder both testified that during petitioner's arrest, he stated, "You're fuckin' crazy, I never heard of the place, I never been there." Tr. 204; 228. This statement is concededly false. While defense counsel questioned Restivo as to why he did not include this statement in his police reports, Tr. 205–09, and intimated that petitioner had never made this statement at all, if credited, it provided further evidence of petitioner's guilt.

■ In sum, because of the strength of the case and the weakness of the exculpatory evidence contained in the DD–5s, it seems clear that the DD–5s would not have affected the outcome of the trial. In reaching this conclusion, I have assumed that the second set of DD–5s may properly be considered. The DD–5s showed that the persons who purchased the cigarettes were the same persons that later committed the robbery. That fact, however, was only made apparent when petitioner submitted the later DD–5s in connection with his motion for reargument. Although the judge hearing the motion for reargument proceeded to consider the merits of petitioner's claim, he first held that petitioner did not offer a valid reason for failing to include the DD–5s in his initial motion. Consequently, petitioner is procedurally barred from relying on the additional police reports in his present habeas petition.

In the reports, which were found in petitioner's mother's closet, Mrs. Terzi and Mr. Rusnjak each stated that the same men who purchased the cigarettes had later committed the robbery. Petitioner did not explain how these reports came into his mother's possession, but it is clear that petitioner's trial counsel was in possession of at least Mrs. Terzi's report at the time of trial. During cross-examination of Detective Restivo, counsel had Restivo read a portion of DD–5, number 26, dealing with Mrs. Terzi's ability to identify the man who killed her husband. Tr. 212. That DD–5 is the same one in which Mrs. Terzi stated that the cigarette purchasers were the same men as the perpetrators and on the basis of which, together with Rusnjak's DD–5, petitioner sought to reargue his § 440.10 motion.

---

**1.** Petitioner's arrest report describes him as having brown hair. Brief on Behalf of Defendant–Appellant, at 5 n.2. This fact, however, is not particularly helpful because testimony during the § 440.10 hearing indicated that petitioner had dyed his hair since the time of the crime. Transcript, § 440.10 Hearing, at 245. It is not clear what color petitioner's hair was at which point.

Without the additional police reports showing that the cigarette purchasers and the perpetrators were the same persons, petitioner's due process claim is significantly weaker. Indeed, in denying the initial § 440.10 motion, the judge held that, "[i]n light of the existing identification evidence, any assistance Basilico and Bovino would have provided if called as defense witnesses is highly speculative. They were not eyewitnesses to the crime. Furthermore, there is nothing which links the perpetrators of the crimes to the young men who earlier had purchased cigarettes from the victim." § 440.10 Decision, at 6.

Contrary to petitioner's contention that the state court's finding is "unsupported by the record," Amend. Pet., at 17, and an "unreasonable determination of the facts," Amend. Pet., at 19, the evidence (as it existed before petitioner's mother discovered the additional police reports) did not establish that the men who purchased the cigarettes were the perpetrators. In particular, Mrs. Terzi and Mr. Rusnjak, the two witnesses who saw both the men who purchased the cigarettes and the perpetrators, never stated at trial that the two groups consisted of the same men. The prosecution specifically asked Mr. Rusnjak whether he recognized the three people that committed the robbery as people he had seen earlier that evening or the people that were outside the door (purchasing the cigarettes), and he responded "I cannot say. They may have been in the place, but I would say a lot of people come and go. I cannot say that I remember. I don't know. If they were there." Tr. 114. While the second set of DD–5s contradict Mr. Rusnjak's trial testimony on this score, the fact remains that the state court's initial decision denying the § 440.10 motion, based on the available evidence, was not unreasonable. Nor was the alternative finding on the motion for reargument that petitioner did not make

any showing as to why the additional police reports, which were allegedly found in his mother's possession, were not offered with his initial § 440.10 motion. Petitioner has failed to show cause or prejudice for this procedural default. Moreover, the reports that petitioner seeks to include in his *Brady* claim do not show that he is actually innocent. *See Strogov v. Attorney General,* 191 F.3d 188, 193 (2d Cir.1999).

## II. Admissibility of In–Court Identification

Mrs. Terzi identified petitioner at trial after having been unable to identify him seven months earlier at the July lineup or from photo arrays. Tr. 71–75. She claims to have blacked out at the lineup. Tr. 71. The circumstances of her at-trial identification were as follows. Mrs. Terzi began to cry towards the beginning of her testimony and the trial judge declared a recess. Tr. 43. During the recess, Mrs. Terzi told her son that she was able to identify petitioner as one of the perpetrators, and her son informed the Assistant District Attorney. Tr. 46. At a conference in the judge's chambers, the Assistant District Attorney then informed the judge and petitioner's counsel of Mrs. Terzi's ability to make an identification. Moreover, while the record is not entirely clear, it appears that during the recess, petitioner was taken from the courtroom by court officers and that this was observed by Mrs. Terzi. Tr. 46. Indeed, in objecting to the identification, petitioner's counsel observed that Mrs. Terzi had "seen this man taken from the courtroom by court officers, brought into the back, the son was there, the witness was there." Tr. 46. The trial judge stated, "[s]he's identifying the man that she is seeing sitting at the defense counsel table, that's the question." Tr. 50. Petitioner's counsel requested a *Wade* hearing to inquire into the matter. The judge

denied the request because there had been no pre-trial identification. Tr. 49, 51. When Mrs. Terzi's testimony continued, she identified petitioner as the perpetrator who pointed a gun at her and said, "Don't ever remember my face otherwise the trigger will go through to your head," and "You never see me. You never seen anything. The police come, you never seen nothing." Tr. 62–63.

Petitioner claims that this in-court identification, made after petitioner entered the courtroom in handcuffs and was seated at the counsel table, was highly suggestive, and that at a *Wade* hearing, which he requested unsuccessfully, "the Court may well have ruled that . . . the prospective in court identification should have been suppressed." Reply to Opposition to Amended Petition for Writ of Habeas Corpus, ¶ 2 ("Petitioner's Reply"). Petitioner first mentioned his being in handcuffs in his reply to the opposition to his amended petition. Nothing in the record substantiates this allegation. Nevertheless, petitioner's claim that the identification was "the equivalent of a showup more than one year after the crime," Petitioner's Reply, ¶ 2, raises serious issues.

■■ The threshold issue presented is whether petitioner's claim is barred by 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214 (1996). Section 2254(d)(1) provides that habeas corpus relief is not available unless a state court's decision is contrary to or an unreasonable application of "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The Supreme Court has explained that this section "restricts the source of clearly established law to this Court's jurisprudence." *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000)

(O'Connor, J., writing for the Court). Section 2254(d) impacts petitioner's claim here. There is no clear Supreme Court holding that a witness, who failed to identify the defendant at a pretrial lineup at which he was represented by counsel, is precluded from making an in-court identification merely because the circumstances there are inherently suggestive.

The conclusions in *United States v. Matthews,* 20 F.3d 538, 547 (2d Cir.1994) and *Bond v. Walker,* 68 F.Supp.2d 287, 302–03 (S.D.N.Y.1999) (McKenna, D.J. & Peck, M.J.), aff'd, 242 F.3d 364, 2000 WL 1804557 (table) (2d Cir. Dec.7, 2000), suggesting the application of the *Biggers* factors to initial in-court identifications, are not compelled by Supreme Court law. *See United States v. Domina,* 784 F.2d 1361, 1368 (9th Cir.1986) (noting that "no holding of the Supreme Court nor of [the Ninth Circuit] has mandated" applying the *Biggers* standards to in-court identifications); *United States v. Beeler,* 62 F.Supp.2d 136, 141 (D.Me.1999) ("The [Supreme Court] and the [First Circuit] have not addressed how the constitutionality of an in-court identification under these circumstances should be analyzed."). Indeed, the Supreme Court has not specifically addressed whether an in-court identification is impermissible because it is patently suggestive. *See Bond,* 68 F.Supp.2d at 298 ("Few cases directly have addressed whether circumstances surrounding an in-court identification can be considered impermissibly suggestive."); *see also United States v. Bush,* 749 F.2d 1227, 1231 (7th Cir.1984) ("The question whether conditions of an in-court identification itself may be so suggestive as to deny a defendant due process of law has been considered by only a few federal courts of appeals."). Consequently, petitioner's claim may be denied on the ground that the admission of Mrs. Terzi's identification was not contrary

to "clearly established Federal law, as determined by the Supreme Court of the United States." Nevertheless, denial is appropriate even without this deferential standard of review.

■■ A criminal defendant has a due process right not to be subjected to suggestive identification procedures that create a "very substantial likelihood of irreparable misidentification." *Manson v. Brathwaite*, 432 U.S. 98, 116, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140 (quoting *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968)). A court must first determine whether the identification process was so suggestive that it raised "a very substantial likelihood of irreparable misidentification," and second, whether the identification was independently reliable. *United States v. Wong*, 40 F.3d 1347, 1359 (2d Cir.1994) (citations omitted). The "central question" is "whether under the 'totality of circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972).

Mrs. Terzi first saw petitioner suggestively seated at the defense table, when she claimed to have recognized him. Tr. 73 ("The moment I saw that boy today, the eyes of that boy I couldn't forget."). She then saw him led out of the courtroom when a recess was taken in apparent response to her emotional reaction to seeing petitioner. *United States v. Matthews*, 20 F.3d 538 (2d Cir.1994), suggests that the *Biggers* analysis applies to suggestive in-court identifications. In *Matthews*, the defendant challenged the admissibility of two in-court identifications based on the suggestiveness of the at-trial setting; the defendant and his co-defendant were seated at the counsel table and were the only black males in the courtroom. *Id.* at 547. One of the eyewitnesses who identified the defendant in-court had failed to recognize the defendant's picture at a pretrial photo array. *Id.* The defendant had not been advised prior to trial that either witness would make an in-court identification, and did not request "any advance procedural measures to reduce the likelihood of an unreliable in-court identification" or object to the identifications until after cross-examination. *Id.* at 547–48. The Second Circuit held that, "where the circumstances of either a pretrial or at-trial identification are suggestive, reliability is the linchpin for determining admissibility," and that "[e]ven an identification at trial under circumstances that are tantamount to a showup is not per se inadmissible, but rather depend[s] upon the 'totality of the circumstances.'" *Id.* at 547 (internal quotations and citations omitted). Because testimony of the eyewitnesses was "sufficient to establish that their identifications had an origin independent of their viewing [the defendant] in the courtroom and hence was sufficient to meet the threshold of reliability," the conviction was affirmed. *Id.* at 548.

Significantly, two subsequent district court cases have applied the *Biggers* analysis to in-court identifications that were challenged on the basis of suggestive at-trial circumstances. *See Bond*, 68 F.Supp.2d at 302–06 (applying the *Biggers* analysis to an in-court identification after discussing *Matthews* and citing the decisions of several other circuits);[2] *see also*

**2.** At the beginning of the *Bond* trial, the defendant had requested a lineup before allowing the witness, who had not seen the defendant since the crime, to identify him in-court.

Because the defendant had not requested a lineup prior to trial, *Bond* had to consider *United States v. Archibald*, 734 F.2d 938 (2d Cir.1984), modified, 756 F.2d 223 (2d Cir.

*Hernandez v. Senkowski,* Nos. CV 98–5270, CV 99–169, 1999 WL 1495443, at *18–19 (E.D.N.Y. Dec.29, 1999) (stating, after determining that the in-court procedure was suggestive and that the jury was witness to the suggestiveness, that "[c]ertainly, the *Neil v. Biggers* factors would have supported a jury conclusion that [the witness] could make an independent identification"). Furthermore, several circuits have applied the *Biggers* analysis to suggestive in-court identifications. *See e.g., United States v. Rogers,* 126 F.3d 655, 658 (5th Cir.1997); *United States v. Murray,* 65 F.3d 1161, 1168–69 & n.6 (4th Cir.1995); *United States v. Hill,* 967 F.2d 226, 231–32 (6th Cir.1992). Accordingly, it is necessary to analyze the suggestiveness and independent reliability of Mrs. Terzi's identification.

1. *Suggestiveness of Mrs. Terzi's In-Court Identification*

■ In this case, Mrs. Terzi saw petitioner seated at the defense counsel table and being escorted out of the courtroom by uniformed court officers—a blatantly suggestive setting. The trial judge himself stated during a conference in his chambers that Mrs. Terzi and her son "know he's a defendant. They know he's the accused. There's no question about that." Tr. 46–47; *United States ex rel. Phipps v. Follette,* 428 F.2d 912, 915 (2d Cir.1970) (noting that "there is always the question how far in-court identification is affected by the witness' observing the defendant at the counsel table"); *see also United States v. Emanuele,* 51 F.3d 1123,

1130 (3d Cir.1995) ("[T]o walk a defendant—in shackles and with a U.S. Marshal at each side—before the key identification witnesses is impermissibly suggestive.").

2. *Independent Reliability of Mrs. Terzi's In-Court Identification*

■ The Supreme Court has set forth a list of at least five factors for use in determining the independent reliability of an in-court identification. They are "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of [the witness'] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Brathwaite,* 432 U.S. at 114, 97 S.Ct. at 2253; *Biggers,* 409 U.S. at 199–200, 93 S.Ct. at 382. These factors are weighed against the corruptive effect of the suggestive identification. *Brathwaite,* 432 U.S. at 114, 97 S.Ct. at 2253.

In this case, Mrs. Terzi did not have a significant opportunity to view the perpetrator she identified as petitioner during the crime. She testified that she looked at the perpetrator for two to three seconds, while the man was pointing a gun at and threatening her, Tr. 74–75, and that the man was about one and a half to two feet away from her. Tr. 63. Mrs. Terzi was immediately forced to lay down on the floor and could therefore hear, but not see, what was happening. Tr. 58. Furthermore, Rusnjak, the bartender, testified that the lights in the kitchen had been turned off. Tr. 108.

1984), where the Second Circuit set forth a pretrial request for a lineup as a prerequisite to challenging an in-court identification. The present case does not implicate *Archibald,* because there was a pretrial lineup at which Mrs. Terzi said she could not identify petitioner, and petitioner had no notice that Mrs. Terzi would make an in-court identification until after she had seen him at the defense table. Under these circumstances, it would have been pointless for petitioner to request another lineup. *See Matthews,* 20 F.3d at 547–48 (examining the reliability of the in-court identification on facts similar to the present case).

Regarding Mrs. Terzi's degree of attention, when asked whether she was looking at the gun more than at the man, Mrs. Terzi testified that "I look at the gun and I look at him." Tr. 94. However, "[e]xperts have confirmed the rather obvious fact that if someone is brandishing a gun at you, your mind is likely to be focused on the gun and not on the facial features of the people involved." *Abdur-Raheem v. Kelly*, 98 F.Supp.2d 295, 304 (E.D.N.Y. 2000) (citing *United States v. Burrous*, 934 F.Supp. 525, 527 (E.D.N.Y.1996)). Mrs. Terzi had a gun pointed at her throughout the time in which she viewed the perpetrator. As a result, this factor does not support the independent reliability of Mrs. Terzi's identification.

It is difficult in this case to assess the accuracy of Mrs. Terzi's prior description of petitioner. According to petitioner's brief on direct appeal, the official police arrest report described petitioner as 21 years of age, brown hair, brown eyes, 5'10", 140 pounds. Brief on Behalf of Defendant–Appellant, at 5 n.2. At trial, there was questioning and testimony about Mrs. Terzi's prior descriptions of the blond perpetrator, Tr. 69–70, 87, the "first man," Tr. 89–90, and the man who killed her husband. Tr. 218. However, it has been established that petitioner was not identified as the blond, and it is not clear whether either of Mrs. Terzi's other descriptions apply to petitioner. This factor therefore has minimal bearing on the reliability analysis.

Mrs. Terzi seemed fairly certain of her in-court identification. She stated, "The moment I saw that boy today, the eyes of that boy I couldn't forget." Tr. 73. However, more critical is the fact that at the non-suggestive pretrial procedures—photograph viewings and the July lineup— Mrs. Terzi completely failed to identify petitioner. *See Emanuele*, 51 F.3d at 1131

("[W]hether subsequent viewings create a substantial risk of misidentification may depend on the strength and propriety of the initial identification."). In *United States v. Concepcion*, 983 F.2d 369, 379 (2d Cir.1992), despite finding that the pretrial procedures were not suggestive, the Second Circuit evaluated the reliability of an in-court identification by a witness who had completely failed to identify the defendant from one pretrial photo array, had been unable to identify the defendant from a second photo array for almost thirty minutes, and had initially selected a different defendant at a *Wade* hearing. The Second Circuit found that the *Biggers* factors did not strongly indicate the reliability of the witness' in-court identification and concluded that the admission of the identification was constitutional error. *Id.; see also Emanuele*, 51 F.3d at 1131 (a witness' failure to identify the defendant at a pretrial photo array, "coupled with the highly suggestive viewing of the defendant" and "bolstered by the comments of another witness," rendered the witness' in-court identification unreliable); *United States v. Beeler*, 62 F.Supp.2d 136, 144–45 (D.Me. 1999) (holding that a witness' failure to pick the defendant out of a fair, non-suggestive pretrial lineup, together with the highly suggestive courtroom conditions, rendered a prospective in-court identification impermissibly unreliable); *but see Matthews*, 20 F.3d at 548 (holding that a witness' in-court identification was independently reliable without discussing the witness' failure to identify the defendant from a pretrial photo array). In this case, Mrs. Terzi's failure to identify petitioner from photographs or at the fair pretrial lineup weighs heavily against a finding of independent reliability.

Finally, the substantial length of time between the crime and Mrs. Terzi's identification at trial—roughly sixteen months— weighs against a finding of reliability. *See*

*Biggers,* 409 U.S. at 201, 93 S.Ct. at 383 ("[A] lapse of seven months between the [crime] and the confrontation ... would be a seriously negative factor in most cases.").

■ While the five *Biggers/Brathwaite* factors suggest that Mrs. Terzi's identification was unreliable, they "do not exhaust the possible ways in which identification evidence may prove to be reliable or unreliable." *Abdur–Raheem,* 98 F.Supp.2d at 305. The latter case contains an extensive argument in support of the proposition that "[r]ather than relying solely on the five specific factors outlined in *Brathwaite,* a sixth factor that looks to corroborating evidence of guilt provides an essential protection against the 'gross miscarriage of justice' that can result from '[a] conviction which rests on a mistaken identification.'" *Id.* at 307 (quoting *Stovall v. Denno,* 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199 (1967)). I need not rely on *Abdur–Raheem* here, because *Sims v. Sullivan,* 867 F.2d 142 (2d Cir.1989), a Second Circuit case involving an in-court identification of the kind challenged here, expressly held that "where the pretrial identification procedures were proper and the other evidence of the defendant's guilt was ample, no deprivation of due process exists." *Id.* at 145.

The petitioner in *Sims* was identified at his trial by a witness who had previously picked the petitioner out of a photo array with some uncertainty. Sims's request for a lineup prior to the in-court identification was denied. Holding that the in-court identification was not so unreliable as to "constitute a denial of fundamental fairness," Judge Winter found that it had not been tainted by any suggestive pretrial procedures. *Id.* As a result, under Second Circuit precedents, he was not obligated to address the independent reliability of the in-court identification. *Id.* But, significantly for the analysis here, the panel nevertheless considered whether the failure to grant a lineup resulted in an in-court identification that was "so unreliable that 'a very substantial likelihood of irreparable misidentification' exists." *Id.* (quoting *Brathwaite,* 432 U.S. at 116, 97 S.Ct. at 2254 (internal quotation omitted)). In other words, the Second Circuit treated the in-court identification as a separate, suggestively obtained, identification.

In analyzing the reliability of this apparently fairly typical—and, thus, highly suggestive—in-court identification of the accused at the defense table, *Sims* held that a federal court is "not bound in a collateral attack upon a state court conviction to view an in-court identification in isolation from the rest of the evidence." *Id.* at 146. Judge Winter went on to explain that "the validity of an in-court identification, and, conversely, the need for a lineup, will ... vary according to the strength and nature of the other evidence against a defendant." *Id.* An accomplice had directly implicated Sims in the charged acts, and another witness had testified that the petitioner had admitted the crime. *Id.* Thus the in-court identification was "less crucial" than it would have been in isolation. *Id.*

It is quite apparent that the analysis in *Sims* was not a harmless error inquiry. As noted, the opinion states expressly that "other evidence of the defendant's guilt" is relevant to the initial question whether a "deprivation of due process exists" as the result of a suggestive identification. *Id.* at 145. Note also that after asserting that in a habeas proceeding the court need not view the identification in isolation from the other evidence, Judge Winter inserted a "cf." citation to *United States v. Archibald,* 734 F.2d 938, 943 (2d Cir.1984), modified on other grounds, 756 F.2d 223 (2d Cir. 1984), which applied harmless error analysis.

Like *Sims,* the present case contains other evidence of petitioner's guilt that bears on the validity of Mrs. Terzi's identification. Petitioner's fingerprint was found at the scene of the crime, expert testimony indicated that the fingerprint could not have lasted for more than a few days, and another witness identified petitioner as being four stores from the restaurant a little over an hour before the crime. The fingerprint evidence also demonstrated the falsity of petitioner's post-arrest statement denying he had ever been in Caesar's Restaurant. This evidence reduces the likelihood that petitioner was misidentified.

 Moreover, this case is different from *Sims* in a way that also lends itself to a traditional harmless error assessment. Unlike *Sims,* there was a pretrial lineup at which the eyewitness could not make an identification. This undermined completely—in a manner quite apparent to the jury—the force of the in-court identification. Significantly, the holdings of the Supreme Court recognize that a jury fully apprised of the relevant facts surrounding a suggestive identification can make an accurate judgment as to the weight to be afforded that evidence. *See Brathwaite,* 432 U.S. at 113 n.14, 97 S.Ct. at 2252 n.14 ("Counsel can both cross-examine the identification witnesses and argue in summation as to factors causing doubts as to the accuracy of the identification including reference to both any suggestibility in the identification procedure and any countervailing testimony such as alibi." (internal citation omitted)). Indeed, the underlying premise of *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), which held that a defendant was entitled to counsel at a lineup, was that counsel's presence would enable the defendant to "reconstruct the manner and mode of lineup identification." *Id.* at 230, 87

S.Ct. at 1934. In so holding, the Supreme Court observed that one of the principal problems faced by an accused at trial is establishing the nature and extent of any unfairness that may have affected the pretrial identification procedures. "[A]ny protestations by the suspect of the fairness of the lineup made at trial are likely to be in vain; the jury's choice is between the accused's unsupported version and that of the police officers present. In short, the accused's inability effectively to reconstruct at trial any unfairness that occurred at the lineup may deprive him of his only opportunity meaningfully to attack the credibility of the witness' courtroom identification." *Id.* at 231–32, 87 S.Ct. at 1934–35 (footnotes omitted).

The circumstances here are exactly the opposite of the *Wade* paradigm. The accused here was represented by counsel at a fairly conducted lineup where the witness could not identify him. Indeed, one of petitioner's lawyers actually testified at the trial and contradicted Mrs. Terzi's explanation for her failure to make an identification. Tr. 251–53. Moreover, the jury was a witness to the in-court identification and the effect the suggestiveness must have had on it. Particularly apposite here is *Hernandez v. Senkowski,* Nos. CV 98–5270, CV 99–169, 1999 WL 1495443 (E.D.N.Y. Dec.29, 1999). Judge Raggi there highlighted the difference between suggestive out-of-court procedures (such as a pretrial lineup), where "the fact finder does not have the benefit of seeing the contemporaneous effect of the suggestive procedure on the witness," and suggestive in-court procedures, where "deference to the jury would seem even more appropriate ... for there 'the jury is present and able to see first-hand the circumstances which may influence a witness.'" *Hernandez,* 1999 WL 1495443, at *18–19 (quoting *United States v. Bush,* 749 F.2d 1227, 1231 (7th Cir.1984)); *see also Bond*

*v. Walker,* 68 F.Supp.2d 287, 303–04 (S.D.N.Y.1999) (McKenna, D.J. & Peck, M.J.) (citing *United States v. Domina,* 784 F.2d 1361, 1368 (9th Cir.1986) (noting that regarding suggestive pretrial identifications, the jurors "are not able to observe the witness making th[e] initial identification"—the "certainty or hesitation of the witness when making the identification, the witness's facial expressions, voice inflection, body language, and the other normal observations one makes in everyday life when judging the reliability of a person's statements")), aff'd, 242 F.3d 364, 2000 WL 1804557 (table)(2d Cir.2000).

In *Hernandez,* after the witness initially failed to identify the defendant in-court, the prosecutor pointed to the defendant and asked the witness whether he was the perpetrator. Judge Raggi concluded that the "jury could decide whether her identification of [the defendant] was a mere timid adoption of the prosecutor's blunt suggestion or the product of her own independent reliable recollection." *Hernandez,* 1999 WL 1495443, at *19. In the present case, Mrs. Terzi viewed petitioner seated at the defense table prior to seeing him taken from the courtroom, and she recognized him while she was on the stand. As a result, the jury was able to see the critical surrounding circumstances of Mrs. Terzi's in-court identification—petitioner seated at the defense table and Mrs. Terzi's manner and demeanor on the stand.

More significantly, perhaps, defense counsel's cross-examination of Mrs. Terzi amply demonstrated the use that petitioner was able to make of the evidence undermining the reliability of her identification. Specifically, Mrs. Terzi's testimony was discredited in a number of ways. Defense counsel elicited the fact that Mrs. Terzi had failed to identify petitioner from photographs or at the lineup in July 1980. Tr. 71–75, 79–81. Mrs. Terzi claimed that she blacked out and "didn't see nobody" at the lineup, Tr. 71, and stated "I was scared. I was terrified. I couldn't see nothing." Tr. 80. Raymond Kobus, an attorney associated with the defense and who was present at the lineup, however, testified that Mrs. Terzi did not state at the time of the lineup that she blacked out, only that she was unable to identify petitioner, and that she appeared "visibly calm," not upset or emotionally disturbed. Tr. 251–53. In addition, Detective James Restivo, who was also present at the lineup, agreed that Mrs. Terzi said that she could not identify anyone, not that she blacked out. Tr. 215. Petitioner's counsel also questioned how Mrs. Terzi's "memory suddenly [came] to life," when the incident had occurred over a year and a half before the trial. Tr. 73–75. He intimated that Detective Restivo and Mrs. Terzi had formed a close relationship, Tr. 67–68, 86; 210–11, and that Restivo had pressured Mrs. Terzi into identifying petitioner by telling her the case would be in trouble without an identification. Tr. 95–96; 220. Additionally, Mrs. Terzi admitted during questioning that the man she identified as petitioner did not have a scar on his face, Tr. 93, even though Detective Restivo later testified that petitioner has a three inch scar on his left cheek. Tr. 216. Finally, regarding her ability to identify petitioner at the trial, Mrs. Terzi stated that, "The moment I saw that boy today, the eyes of that boy I couldn't forget," Tr. 73, and that she recalled telling the police that she remembers "his eyes and his front." Tr. 78. Counsel suggested through questioning that Mrs. Terzi had never told anyone, particularly Detective Restivo or the Grand Jury, about remembering the eyes or front of petitioner, the man who pointed a gun at her. Tr. 85–88; 211–12.

Significantly, the testimony that the jury asked to have read back confirms that Mrs. Terzi's identification did not have a

substantial and injurious effect on the verdict. The jury asked for (1) the testimony of Irving Silver, who identified petitioner as a person he had seen about four stores away from Caesar's Restaurant a little over an hour before the robbery, (2) the testimony of the fingerprint experts, and (3) the cross-examination of Detective Restivo. While the Restivo cross-examination related to more than one issue, it did contain his recollection of the lineup at which Mrs. Terzi made no identification, it contradicted Mrs. Terzi's explanation that she blacked out at the lineup, and it contained other facts which further undermined her in-court identification.

In conclusion, the admission of Mrs. Terzi's in-court identification did not violate petitioner's right to due process because of the other corroborative evidence of petitioner's guilt. Moreover, this evidence combined with the jury's ability to see for itself the suggestive circumstances under which Mrs. Terzi identified petitioner and hear petitioner's counsel attack the identification on cross-examination, rendered harmless error in admitting her testimony. *Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 1714, 123 L.Ed.2d 353 (1993); *Samuels v. Mann,* 13 F.3d 522, 528 (2d Cir.1993) ("[T]o conclude that the error was harmless in a case of this kind, we need not find that the improperly admitted evidence had no effect at all ... we need only find that the effect was not 'substantial and injurious.'" (internal quotation omitted)).

■ On a final note, petitioner's challenge to the in-court identification implicated the one-year period of limitations applicable to writs of habeas corpus. 28 U.S.C. § 2244(d)(1). The limitation period "is tolled during the time that a properly filed application for state post-conviction review is pending." *Acosta v. Artuz,* 221 F.3d 117, 119 (2d Cir.2000) (citing 28

U.S.C. § 2244(d)(2)). In this case, since petitioner's judgment of conviction became final before the enactment of this limitations period, the one-year period of limitation began to run on April 24, 1996, the date of enactment. *See id.* at 120. A review of the timing of petitioner's state court proceedings indicates that the one-year period of limitations expired before petitioner raised his challenge to Mrs. Terzi's in-court identification in his amended petition. Consequently, this claim would be time-barred, unless petitioner can establish that it relates back to his original petition in accordance with Rule 15(c) of the Federal Rules. *See Fama v. Commissioner of Corr. Servs.,* 235 F.3d 804, 815–16 (2d Cir.2000) (holding that Rule 15(c) governs whether an amended habeas petition relates back to an original petition). Rule 15(c) provides that "[a]n amendment of a pleading relates back to the date of the original pleading when ... the claim ... asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Fed. R.Civ.P. 15(c).

The relief petitioner sought in his original petition was clearly limited to his *Brady* claim. In the same petition, however, he described the circumstances of Mrs. Terzi's eyewitness identification, and alleged that the trial judge erred in denying counsel's motion for a *Wade* hearing. Original Petition, ¶ 12. Petitioner also described Mrs. Terzi's identification as "a weak and probably, suggested, identification." *Id.,* ¶ 18. Under these circumstances, the original petition was sufficient to give notice of petitioner's later challenge to Mrs. Terzi's identification. *See Stevelman v. Alias Research Inc.,* 174 F.3d 79, 86 (2d Cir.1999) ("[T]he central inquiry is whether adequate notice of the matters raised in the amended pleading has been

given to the opposing party within the statute of limitations 'by the general fact situation alleged in the original pleading.' " (citation omitted)). Indeed, based on the allegations in the original petition, I suggested that petitioner file an amended petition asserting formally the argument that Mrs. Terzi's identification was not admissible.

## CONCLUSION

The petition for a writ of habeas corpus is denied. Petitioner is granted a certificate of appealability with respect to each of the two issues on which he sought habeas corpus relief.

SO ORDERED.